The PEOPLE of the State of
Colorado, Petitioner,

v.

Robert Earl McNEESE, Respondent.

No. 93SC450.

Supreme Court of Colorado,
En Banc.

March 13, 1995.

Rehearing Denied April 17, 1995.

---

A. William Ritter, Jr., Dist. Atty., Second Judicial Dist., Nathan B. Coats, Chief Appellate Deputy Dist. Atty., Denver, for petitioner.

David F. Vela, State Public Defender, Frances Smylie Brown, Chief Deputy State Public Defender, Denver, for respondent.

Justice ERICKSON delivered the Opinion of the Court.

We granted certiorari to review *People v. McNeese*, 865 P.2d 881 (Colo.App.1993). We reverse and return this case to the court of appeals for remand to the district court to make findings of fact and conclusions of law consistent with this opinion or to conduct a further or new hearing.

The defendant, Robert Earl McNeese, was charged with first-degree murder,[1] attempted first-degree murder,[2] and first-degree assault.[3] After a preliminary hearing, the county court bound the defendant over for trial on two counts of second-degree murder.[4] The defendant was also bound over for trial on the attempted first-degree murder and first-degree assault charges arising out of the stabbing of Vivian Daniels. Defendant pleaded not guilty and filed a motion to dismiss in the district court, alleging that he was immune from prosecution under the "make-my-day" statute, section 18–1–704.5, 8B C.R.S. (1986).[5] Section 18–1–704.5 provides:

---

1. § 18–3–102(1)(a), 8B C.R.S. (1986).

2. § 18–2–101(1), 8B C.R.S. (1986).

3. § 18–3–202(1)(a), 8B C.R.S. (1986).

4. § 18–3–103(1)(a), 8B C.R.S. (1986).

5. The defendant's motion to dismiss sought immunity from prosecution on the second-degree murder charges for the killing of both John Daniels and David Wessels, and the attempted first-degree murder and first-degree assault charges

arising out of the stabbing of Vivian Daniels. On certiorari, the sole issue is whether the defendant established by a preponderance of the evidence that he was entitled to immunity from prosecution under the "make-my-day" statute for the death of John Daniels.

A defendant may assert the "make-my-day" defense by motion and may raise the defense at trial as an affirmative defense.

> In such an instance, the burden of proof generally applicable to affirmative defenses would apply to the defense created by sec-

**Use of deadly physical force against an intruder.**

(1) The general assembly hereby recognizes that the citizens of Colorado have a right to expect absolute safety within their own homes.

(2) Notwithstanding the provisions of section 18–1–704, any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made *an unlawful entry into the dwelling,* and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling *in addition to the uninvited entry,* or is committing or intends to commit a crime against a person or property *in addition to the uninvited entry,* and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.

(3) Any occupant of a dwelling using physical force, including deadly physical force, in accordance with the provisions of subsection (2) of this section shall be immune from criminal prosecution for the use of such force.

(4) Any occupant of a dwelling using physical force, including deadly physical force, in accordance with the provisions of subsection (2) of this section shall be immune from any civil liability for injuries or death resulting from the use of such force.

(Emphasis added.)

Following a pretrial hearing, the trial judge granted the defendant's motion to dismiss the second-degree murder charge for the stabbing death of John Daniels. The defendant's motion to dismiss the charges of second-degree murder of Wessels and attempted first-degree murder and first-degree assault of Vivian Daniels was denied.

I

Vivian Daniels testified that she was not getting along with John Daniels, her common-law husband, and was looking for a place to stay.[6] She contacted the defendant and asked whether she could stay in his apartment and sleep on his couch. The apartment contained a small bedroom, a bathroom, and a combined living room and kitchen. Vivian Daniels moved into the defendant's apartment after agreeing to pay rent and on the condition that John Daniels was not to enter or come into the apartment under any circumstances. The defendant is an African–American, and the testimony established that John Daniels had a reputation for not liking African–Americans and was prone to violence, especially after he had been drinking. Vivian Daniels told the defendant that John Daniels had killed another man.[7] John Daniels knew that the defendant did not want him in the apartment.

Vivian Daniels agreed to pay the defendant $50 a month for rent and to contribute funds for her share of the food. The defendant gave her a key shortly after she moved in, and she kept her clothes, television, art work, bedding, fan, and cat in the apartment. John Daniels never entered the apartment and would wave from across the street or knock

tion 18–1–704.5(2). The defendant would be required to present some credible evidence supporting the applicability of section 18–1–704.5(2); and, if such evidence is presented, the prosecution would then bear the burden of proving beyond a reasonable doubt the guilt of the defendant as to the issue raised by the affirmative defense as well as all other elements of the crime charged. § 18–1–407, 8B C.R.S. (1986).

*People v. Guenther,* 740 P.2d 971, 981 (Colo. 1987).

**6.** Vivian Daniels was the only perceiving witness and offered the only direct testimony as to what occurred in the apartment that led to the filing of charges against the defendant. The defendant did not testify. Eight witnesses were called by

the defendant to testify to John Daniels' reputation for fighting and for violence and to statements made by John and Vivian Daniels.

**7.** At the Denver District Court hearing, Dan Wyckoff, a detective with the City and County of Denver, testified that John Daniels was charged with second-degree murder for the death of Steven Frets on March 7, 1990. Vivian Daniels was present when John Daniels, while intoxicated, shot Frets. John Daniels claimed that the shooting had been an accident and that Steven Frets had been his best friend. John Daniels plea bargained the second-degree murder charge down to reckless homicide, and was placed on probation.

on the window when he wanted to see his wife.

On November 15, 1991, approximately three months after moving into the apartment, Vivian Daniels and the defendant spent the day drinking at various bars. When they returned to the apartment, the defendant made sexual advances and Vivian Daniels decided to move. The defendant agreed that she should move out. She left the defendant's apartment at 11:30 p.m. on a cold, snowy night without a coat or any of her belongings. She went to John Daniels' apartment, which was about six blocks away.

Keith Tollefson, who shared the apartment with John Daniels, let her in, and she slept on a couch until John Daniels returned. John Daniels and David Wessels had both been drinking heavily at a number of bars and, when they returned to the apartment, they were told of the sexual advances made by the defendant. They decided to get Vivian Daniels' clothes and possessions from the defendant's apartment. John Daniels told Vivian Daniels there would be no violence. However, a defense witness testified he overheard John Daniels say to Wessels, in the presence of Vivian Daniels just before they left to go to the defendant's apartment, "let's go kill that fuckin' nigger." Vivian Daniels denied that John Daniels made such a statement to David Wessels. John Daniels had a blood alcohol level of .349, and Wessels had a blood alcohol level of .188. Vivian Daniels admitted that she was drunk. At approximately 2:30 a.m., John Daniels, Vivian Daniels, and Wessels entered the defendant's apartment using Vivian Daniels' key.

The defendant was in his bedroom asleep. When John Daniels went to get his wife's clothes out of the closet located immediately outside of the bedroom, he opened the defendant's door and talked to the defendant from the doorway. After Vivian Daniels asked her husband to help her collect her belongings, he returned to the living room and the defen-

dant followed. Vivian Daniels went to the defendant's bedroom to get her pillow, and, when she returned to the living room, John Daniels was on the couch with his arm around the defendant's throat applying a chokehold and threatening to kill the defendant if he harmed Vivian Daniels.

The altercation ended after approximately two or three minutes. Vivian Daniels testified that neither the defendant nor John Daniels was hurt, and they were not arguing.

Vivian Daniels was gathering her possessions when she saw Wessels lying on the floor by the front door and John Daniels on the floor near the kitchen. The defendant confronted Vivian Daniels and stabbed her in the head. She ran from the apartment and called the police.[8] Vivian Daniels could not recall anything else. She testified that she did not see, hear, or know what occurred when John Daniels and David Wessels were stabbed to death.[9]

## II

The trial judge centered his analysis on the oral lease agreement between the defendant and Vivian Daniels, and concluded that, since Vivian Daniels was entitled to a three-day notice of eviction, she was authorized to return to the apartment on November 16, 1991. The trial judge also held that she had the right to invite David Wessels into the apartment. However, allowing John Daniels to enter the apartment violated the oral lease agreement between Vivian Daniels and the defendant and made John Daniels' entry into the apartment unlawful.

The trial judge held John Daniels inflicted a third-degree assault on the defendant, and that the assault satisfied the requirement that John Daniels had committed or intended to commit a crime on the premises. *See* § 18–1–704.5(2) & (3). Also, because the physical contact may not have been over, the trial court held that the defendant was justi-

---

8. John Daniels, Wessels, and Vivian Daniels had been in the apartment for approximately twenty minutes before Vivian Daniels was stabbed. Approximately five to ten minutes elapsed from the time of the altercation between the defendant and John Daniels, and the time that Vivian Daniels was stabbed.

9. The defendant told the investigating police officers and a paramedic that he suffered an injury to his neck when John Daniels applied the choke hold.

fied in fearing that John Daniels might use further physical force against him. The trial court found that the defendant established immunity from prosecution because he met the requirements of the "make-my-day" statute.

The prosecution appealed the trial judge's order of dismissal pursuant to section 16–12–102, 8A C.R.S. (1994 Supp.). The court of appeals affirmed the trial judge and concluded that the terms "unlawful" and "uninvited" in section 18–1–704.5 were used interchangeably by the General Assembly. *People v. McNeese*, 865 P.2d at 884.[10] Judge Tursi, writing for a divided court, concluded that John Daniels' entry was both uninvited and unlawful because Vivian Daniels' oral lease with the defendant denied her authority to invite John Daniels into the defendant's apartment. The court of appeals held that the trial judge did not err in finding that John Daniels inflicted a third-degree assault on the defendant or in finding that the defendant reasonably believed John Daniels might use further physical force against him. *Id.*

Judge Taubman, in his dissent, asserted the statutory terms "unlawful" and "uninvited" were not interchangeable, and that section 18–1–704.5 required a finding that the entry was *both* unlawful and uninvited. *McNeese*, 865 P.2d at 886 (Taubman, J., dissenting). Judge Taubman concluded that John Daniels' entry was unlawful because it violated the terms of Vivian Daniels' tenancy, but was not uninvited since Vivian Daniels "clearly invited the decedent into the apartment, albeit that she was not authorized to make such an invitation." *Id.* Judge Taubman would have vacated the order of dis-

missal and would have reinstated the murder charge against the defendant for the stabbing death of John Daniels.

The findings of fact and conclusions of law of the trial judge were based on an erroneous interpretation of the elements that must be proven to obtain immunity under section 18–1–704.5. Accordingly, the findings and conclusions were erroneous as a matter of law and are not binding on this court. *People v. Dover*, 790 P.2d 834 (Colo.1990).

The court of appeals also erred in its analysis of the "make-my-day" statute. The General Assembly did not intend that the occupant of a dwelling be granted immunity from prosecution for the appearance of an unlawful entry by an intruder. *Guenther*, 740 P.2d at 979. The fact that John Daniels' entry may have been uninvited because the entry violated an oral agreement, does not establish that the entry was a knowing violation of the criminal law.[11] John Daniels' entry does not satisfy the unlawful entry element in the "make-my-day" statute.

Section 18–1–704.5 contains two separate elements. In order to be granted immunity the defendant must first prove by a preponderance of the evidence that there was an unlawful entry. The second statutory requirement involves a determination of whether the occupant had a reasonable belief that the intruder intended to commit or committed a crime in the dwelling. When the legislature enacted 18–1–704.5 as part of the criminal code it did not define all of the terms used in the statute. We are guided by other provisions in the criminal code in determining the definition of unlawful entry

---

10. The court of appeals stated:

> Had the General Assembly intended to distinguish between *an* unlawful entry and *an* uninvited entry, it would have done so. Instead, § 18–1–704 grants immunity to an occupant who uses deadly force against a person who has made "an unlawful entry" into the occupant's dwelling. The statute then by the use of the definite article "the" refers back to the unlawful entry as "the uninvited entry."
>
> Here, giving effect to the plain and ordinary meaning of the statutory words and phrases, we conclude that the legislative intent was to use "unlawful entry" and "uninvited entry" interchangeably.

*McNeese*, 865 P.2d at 884.

11. Generally, a person who has permission to enter an apartment from one who is a tenant of the apartment does not enter the apartment unlawfully or commit a criminal trespass. *See People v. Horne*, 619 P.2d 53, 58 (Colo.1980) (stating that the crux of criminal trespass is whether defendants had permission, or believed they had permission, to enter the apartment where they were apprehended); *People In re D.G.P.*, 194 Colo. 238, 241, 570 P.2d 1293, 1295 (1977) (stating that there is no unlawful entry or trespass by a defendant who had a key and the implied permission of one whom he believed was a tenant).

and the elements that must be proven by a preponderance of the evidence.

## III

Section 18–1–704.5 is part of the criminal code (Title 18). Article 1 of the criminal code includes "Provisions Applicable to Offenses Generally." The article contains part 7, labelled "Justification and Exemptions from Criminal Responsibility." Part 7 includes statutes justifying the use of physical force against a person, use of physical force in defense of premises, and use of physical force in defense of property. *See* § 18–1–704, 8B C.R.S. (1986); § 18–1–705, 8B C.R.S. (1986); § 18–1–706, 8B C.R.S. (1986). The "make-my-day" statute lies in the criminal code along side these statutes. Section 18–1–704.5 is similar to self-defense and extends the justifications and exemptions formulated in part 7. The "make-my-day" statute justifies "deadly physical force," not just "physical force." *See* § 18–1–704.5, 8B C.R.S. (1986). However, the statute is not a license to commit homicide. The occupant of a dwelling is granted immunity from criminal prosecution for homicide, so safeguards must be imposed. Because the statute readily grants immunity for the taking of a life, the "knowingly" mens rea is required to carry out the principles of self-defense.

The specific provisions of the "make-my-day" statute permit an occupant of a dwelling to use physical force, including deadly physical force, against an intruder. Immunity from criminal prosecution is granted for acts and conduct that would be criminal but for the statute. Immunity may be determined by the court in a Crim.P. 12 motion to dismiss or as an affirmative defense at the time of trial. *People v. Guenther*, 740 P.2d 971, 981 (Colo.1987).[12] When section 18–1–704.5(3) is invoked prior to trial, the burden is on the defendant to establish by a preponderance of evidence, that:

(1) another person made an unlawful entry into the defendant's dwelling; (2) the defendant had a reasonable belief that such other person had committed a crime in the dwelling in addition to the uninvited entry, or was committing or intended to commit a crime against a person or property in addition to the uninvited entry; (3) the defendant reasonably believed that such other person might use physical force, no matter how slight, against any occupant of the dwelling; and (4) the defendant used force against the person who actually made the unlawful entry into the dwelling.

*Guenther*, 740 P.2d at 981.

A prerequisite for immunity under the "make-my-day" statute is an unlawful entry into the dwelling. *Id.; People v. Drennon*, 860 P.2d 589, 591 (Colo.App.1993); *see also People v. Malczewski*, 744 P.2d 62, 63 (Colo. 1987) (finding no evidence to support the district court's conclusion that a police officer's entry into apartment was unlawful). The explicit terms of the statute provide the occupant of a dwelling with immunity from prosecution only for force used against a person who has made an unlawful entry into the dwelling, but not against a person who remains unlawfully in the dwelling. *Drennon*, 860 P.2d at 591.

The *Guenther* reasonable belief standard relates only to the defendant's state of mind once the intruder is inside the dwelling:

There is nothing in section 18–1–704.5 suggesting that the General Assembly intended to broaden the conditions for statutory immunity to include a home occupant's right to use any degree of physical force against another person solely on the basis of an appearance, rather than the actuality, of an unlawful entry into the dwelling by that other person. The legislature adopted a "reasonable belief" or "appearance" standard in section 18–1–704.5 only with respect to those other statutory criteria for immunity relating to the intruder's conduct inside the dwelling. Under these circumstances, we are satisfied that the failure to include a similar "reasonable belief" or "appearance" standard with respect to the unlawful entry element of

---

12. The legislative purpose for permitting determination of the "make-my-day" defense prior to trial was to prevent the occupant of a dwelling from incurring the expense of trial when the statutory requirements for immunity have been met.

immunity was the result of deliberate legislative choice.

*Guenther,* 740 P.2d at 979 (footnotes omitted).

## IV

### A

█ Our primary purpose in construing a statute is to ascertain and give effect to the intent of the General Assembly. *State Eng'r v. Castle Meadows, Inc.,* 856 P.2d 496, 504 (Colo.1993). To discern the intent of the General Assembly, we first look to the plain language of the statute. *Lakewood v. Mavromatis,* 817 P.2d 90, 96 (Colo.1991). When statutory language is ambiguous, we may consider the circumstances under which the statute was enacted, the legislative history, and the consequences of a particular construction in determining the General Assembly's intent. *Castle Meadows,* 856 P.2d at 504.

In the House and Senate debates on the original "make-my-day" bill, the sponsors bill referred to the bill as a "homeowner's protection bill." *See, e.g., Hearing on H.B. 1361 Before the House Judiciary Committee,* 55th Gen. Assembly, First Reg.Sess. (Hearing Tape 85–13, Mar. 7, 1985, at 66:15:29:30); *Debate on H.B. 1361 Before the Senate,* 55th Gen. Assembly, First Reg.Sess. (Hearing Tape 85–21, Apr. 16, 1985, at 106:10:11:38). In describing the function of the bill, the House and Senate sponsors repeatedly alluded to the bill's protection of homeowners from "intruders" and people who "break[ ] and enter[ ]" into homes "illegally." *See Hearing on H.B. 1361 Before the House Judiciary Committee,* 55th Gen. Assembly, First Reg.Sess. (Hearing Tape 85–13, Mar. 7, 1985, at 66:15:38:48); *Debate on H.B. 1361 Before the House,* 55th Gen. Assembly, First Reg. Sess. (Hearing Tape 85–16, Mar. 19, 1985, at 78:11:06:09); *Debate on H.B. 1361 Before the Senate,* 55th Gen. Assembly, First Reg.Sess. (Hearing Tape 85–21, Apr. 16, 1985, at 106:10:21:15 & 106:10:43:31 & 106:10:53:51).

█ The sponsors pointed out the bill's potential for deterring criminals from breaking into homes. *Debate on H.B. 1361 Before the House,* 55th Gen. Assembly, First Reg. Sess. (Hearing Tape 85–16, Mar. 19, 1985, at 78:11:33:20); *Debate on H.B. 1361 Before the Senate,* 55th Gen. Assembly, First Reg.Sess. (Hearing Tape 85–21, Apr. 16, 1985, at 106:10:30:35). The typical scenario discussed in the debates and hearings involved an illegal entry into a home by a stranger in the middle of the night. The legislative history indicates that the General Assembly intended the "make-my-day" statute to apply in situations where an intruder illegally enters a dwelling. The hearings and debates also demonstrate that the bill was meant to deter criminals from breaking into a home to commit a crime. The legislative history supports the conclusion that an unlawful entry means a knowing, criminal entry into a dwelling.

### B

█ The General Assembly is vested with constitutional authority not only to define criminal conduct and to establish the legal components of criminal liability but also to delineate statutory defenses and bars to criminal prosecution. *Guenther,* 740 P.2d at 977. In *Guenther* we said "[s]ubsection (2) of the statute states that an occupant of a dwelling is justified in using physical force 'against *another person* when *that other person* has made an unlawful entry into the dwelling' (emphasis added) and when the additional statutory requirements are met." *Id.* at 979 (quoting § 18–1–704.5(2), 8B C.R.S. (1986)). The plain language of the statute, as we said in *Guenther,* requires proof of an actual unlawful entry and not merely a reasonable belief that the entry was unlawful. *Guenther,* 740 P.2d at 979. The statute does not require that the entry be both unlawful and uninvited, or that the entry be either unlawful or uninvited. The defendant must establish an unlawful entry to satisfy the threshold statutory requirement.

The most vexing question under the "make-my-day" statute is the proper definition of "unlawful entry." For purposes of section 18–1–704.5, the "unlawful entry" element requires an entry in knowing violation of the criminal law. The statutory language justifies an occupant's use of physical force

against another person when the other person is knowingly engaging in criminal conduct. The statute provides that the occupant of the dwelling must reasonably believe that a crime has been, is being, or will be committed *in addition to* the threshold requirement of proof of an unlawful entry. By providing both objective [13] and subjective elements, the structure of section 18–1–704.5 contemplates that an unlawful entry means a knowing, criminal entry.

We recognize that the statute does not expressly describe a culpable mental state of "knowingly." However, if "no culpable mental state is expressly stated in a statute ... a culpable mental state may nevertheless be required ... with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such a culpable mental state." § 18–1–503, 8B C.R.S. (1986). Under the "make-my-day" statute, an "unlawful entry" requires a "culpable mental state." Without a culpable mental state for the "unlawful entry" requirement, an occupant of a dwelling would be immune from criminal prosecution for the homicide of any unanticipated or unexpected "intruder." The statute was not intended to encourage arbitrary, casual killings.

■ Legislative silence on the element of intent in a criminal statute is generally not construed as an indication that no mental state is required. *People v. Moore*, 674 P.2d 354, 358 (Colo.1984); *People v. Bridges*, 620 P.2d 1, 3 (Colo.1980). In both *Moore* and *Bridges*, we implied a mental state of "knowingly" to criminal statutes that did not describe a culpable mental state. *See Moore*, 674 P.2d at 358; *Bridges*, 620 P.2d at 3. Implying the mental state "knowingly" to the "make-my-day" statute squares with the objective nature of the "unlawful entry" element as established by the General Assembly. *See Guenther*, 740 P.2d at 979.

■ The statute was enacted to immunize the occupant of a dwelling from prosecution for using physical force against another person who has committed, is committing, or intends to commit criminal acts in the dwelling. Immunity from criminal prosecution provides protection to the occupant of a dwelling who uses force against an intruder who has knowingly and unlawfully entered the dwelling to commit a crime. The immunity was not intended to justify use of physical force against persons who enter a dwelling accidentally or in good faith.

Requiring a knowing, criminal entry reconciles two competing interests. First, the General Assembly recognized that an occupant of a dwelling should be able to use force against an intruder who knowingly and unlawfully enters the dwelling. Second, the General Assembly did not want to encourage the use of physical force in response to otherwise benign situations. The knowing, criminal entry requirement affords the occupant of a dwelling sufficient protection from criminal prosecution, while discouraging random violence.

■ The elements of first and second degree burglary [14] established by the General

---

**13.** Before assuming its present form, the "make-my-day" statute required that an occupant have "a reasonable belief that the intruder's entry was unlawful and forcible...." Dr. William Wilbanks, *The Make My Day Law* 326 (1990). However, the language of the enacted law protects an occupant "using deadly force only when he is correct that the entry was unlawful and uninvited—a reasonable belief is not good enough." *Id.* The objective language of the "unlawful entry" requirement permits "second-guessing" the reasonableness of an occupant's actions. *Id.* at 328. By failing to attach a reasonable belief standard to the "unlawful entry" element, the General Assembly may have eliminated its intent to remove the need for reflection by an occupant prior to taking protective action. *See id.* at 26; *see also id.* at 328 ("It thus appears that the failure to attach the reasonable belief standard to

the nature of the entry was an [sic] mistake by the Legislature that should be corrected.").

**14.** Two commentators noted how contemporary criminal codes articulate the common law element of "a breaking" in burglary.

> In the modern American criminal codes, only seldom is there a requirement of a breaking. This is not to suggest, however, that elimination of this requirement has left the "entry" element unadorned, so that any type of entry will suffice. Rather, at least *some* of what was encompassed within the common law "breaking" element is reflected by other terms describing what kind of entry is necessary. The most common statutory term is "unlawfully."

Wayne R. LaFave & Austin V. Scott, Jr., *Substantive Criminal Law* § 8.13(a) (1986 & 1995 Supp.)

Assembly may satisfy the "unlawful entry" requirement. *See* § 18–4–202(1), 8B C.R.S. (1986) ("A person commits first degree burglary if he [or she] knowingly enters or remains unlawfully in a building or occupied structure with the intent to commit therein a crime...."); § 18–4–203(1), 8B C.R.S. (1986) ("A person commits second degree burglary, if he [or she] knowingly breaks an entrance into, or enters, or remains unlawfully in a building or occupied structure with intent to commit therein a crime against a person or property."). First and second degree trespass [15] might also meet the "unlawful entry" requirement. *See* § 18–4–502, 8B C.R.S. (1994 Supp.) ("A person commits the crime of first degree criminal trespass if such person knowingly and unlawfully enters or remains in a dwelling of another...."); § 18–4–503(1), 8B C.R.S. (1995 Supp.); *Bollier v. People*, 635 P.2d 543, 546 (Colo.1981) (construing section 18–4–503 "as having an implied mental state of 'knowingly'"). Where the elements of the crimes differ, the "make-my-day" statute does not extend to persons who unlawfully remain on property. The intruder's mental state must reflect an entry in knowing violation of the criminal code. Unlawfully remaining on property does not include a sufficient mens rea to satisfy the unlawful entry requirement of section 18–1–704.5. *People v. Drennon*, 860 P.2d 589, 591 (Colo.App.1993).

Every "unlawful entry" is necessarily uninvited. The General Assembly's reference to "uninvited entry" in section 18–1–704.5(2), 8B C.R.S. (1986), is therefore consistent with, and refers back to, the term "unlawful entry" used in the same subsection.[16]

Under the "make-my-day" statute, a person may be uninvited, but still may be lawfully on the premises. In *People v. Malczewski*, 744 P.2d 62 (Colo.1987), a police officer sought to enter the defendant's apartment to take the defendant's child into temporary custody, but the defendant would not allow him to enter. After the officer entered the apartment, over the defendant's objections, the defendant struck the officer numerous times. The officer suffered injuries on his head and throat, and the defendant was charged with second-degree assault for the beating of the officer.

In *Malczewski*, the defendant sought immunity from prosecution under the "make-my-day" statute. The trial judge concluded that the police officer's entry was uninvited and therefore unlawful and granted the defendant immunity from prosecution and dismissed the charges against the defendant. *Id.* at 64.

We held that because the officer acted within his statutory authority by entering the apartment to take the child into temporary custody, there was "no evidence supporting the district court's determination that the officer's entry into the apartment was unlawful." *Id.* at 66 (footnote omitted); *see* § 18–1–704.5 (twice referring to the commission of a crime in addition to the initial entry); William Wilbanks, *The Make My Day Law: Colorado's Experiment in Home Protection* 276 (1989) (concluding that all occurrences of "uninvited entry" should be changed to "un-

---

(footnotes omitted). The historical context of the term "unlawful entry" requires a criminal law inquiry. Here, any breach of the oral lease agreement exists in the realm of civil law and does not satisfy the requirement of a criminal unlawful entry.

15. We recognize that first degree criminal trespass requires a knowing, unlawful entry of "a dwelling," while second degree criminal trespass calls for a knowing, unlawful entry upon "premises." *See* § 18–4–502, 8B C.R.S. (1994 Supp.); § 18–4–503(1), 8B C.R.S. (1994 Supp.). However, our definition of "unlawful entry" turns on a distinction between mental states. It does not

rely on the difference between "dwelling" and "premises."

16. In requiring "*an* unlawful entry," the statute employs an indefinite article, which is generally used where the reference has not been previously made known to the reader. Thereafter, the statute refers to "*the* uninvited entry" using a definite article, which refers to something that can be identified, either contextually or within the general knowledge shared by the speaker and reader. *See* Randolph Quirk et al., *A Comprehensive Grammar of the English language* §§ 5.27, 5.36 (1985). Grammatically, "the uninvited entry" refers the reader to the identified subject of "an unlawful entry."

lawful entry" in the make-my-day statute).[17]

## V

■ In addition to an unlawful entry, the "make-my-day" statute requires that the occupant have a reasonable belief that the intruder has committed, or intends to commit, a crime in the dwelling. § 18-1-704.5; *Guenther*, 740 P.2d at 981. Analysis of the subjective belief requirement is only undertaken after the threshold unlawful entry requirement has been satisfied.

The prosecution contends that the defendant failed to establish by a preponderance of the evidence that he had a reasonable belief that John Daniels committed or intended to commit a crime against a person or property in the dwelling in addition to an unlawful entry. We agree.

The court of appeals held that there is nothing in the record to suggest that the district court erred in finding that John Dan-

iels inflicted a third-degree assault on the defendant, and that the defendant reasonably believed that John Daniels might use further physical force against him.[18] In affirming the district court, the court of appeals failed to articulate the appropriate standard of review for determining whether the second requirement of the "make-my-day" statute was satisfied.

To be immune from prosecution under the "make-my-day" statute, a defendant must establish by a preponderance of the evidence that he "had a reasonable belief that such other person had committed a crime in the dwelling in addition to the uninvited entry, or was committing or intended to commit a crime against a person or property in addition to the uninvited entry...." *Guenther*, 740 P.2d at 981. The inquiry for the second requirement focuses on the reasonable belief of the occupant. It does not center on the actual conduct of the intruder.[19] The defen-

17. The trial judge also concluded that because Vivian Daniels did not have the authority to invite John Daniels to the defendant's apartment, his entry was unlawful. The trial judge stated:

It appears to me clear, however, that Mr. John Daniels, even if he was granted access into the apartment by Ms. Daniels, through the implementation or use of the key, that this was done so in an unlawful manner since the lease, or the understanding between the defendant and Ms. Daniels, also known as Ms. Ford, included the explicit agreement, or condition that Mr. John Daniels was not allowed in this apartment under any circumstances.

18. On the issue of John Daniels' use of further physical force against defendant, the trial judge concluded:

The next element would be that the defendant believes that the intruder might use physical force no matter how slight against him, and I don't necessarily agree that the interaction, the physical interaction between the defendant and the victim, John Daniels, who was inflicting this upon him, was over and I looked at the context of the situation here, again including the contrast and the size of the victim vs. the defendant, were, of course, the victim being the larger person, the strange hours in the morning when this business is being accomplished, the intoxication of the victim, Mr. John Daniels, the propensity he had for not necessarily being simply a person who disliked African Americans, but a person who seemed to be inclined to intimidate and harass others, and the fact he had already taken this step earlier in the evening, would lead me to conclude that any person in the situation of the

defendant would easily expect, and could look forward to fear and would be justified in having the fear that the intruder in this case, Mr. Daniels, might use some further physical force against him, the defendant.

19. Proving the commission of a crime would create a strong presumption that the occupant had a reasonable belief that a crime had been, was being, or would be committed. However, Vivian Daniels' testimony was insufficient to establish that John Daniels committed a third-degree assault on the defendant.

Vivian Daniels testified that John Daniels went to McNeese's bedroom door, opened it, and talked to McNeese from the doorway. John Daniels then came back to the living room, followed shortly thereafter by McNeese. Vivian Daniels, the only perceiving witness who testified, then went into the bedroom to get her pillow. Upon returning to the living room, she saw John Daniels and McNeese wrestling on the couch.

There is no evidence from which it could be determined who started the physical affray. Under these circumstances, the district court's finding that John Daniels assaulted McNeese is based simply on speculation and is not supported by a preponderance of the evidence. Evidence of John Daniels' propensity for violence and his "prior comments in going to this location," particularly when considered in the context of John Daniels' nonviolent behavior when he first went to McNeese's bedroom door and then walked away, and in absence of any testimony from McNeese, the only living perceiving witness, cannot support a finding by a preponderance of the

dant failed to prove by a preponderance of the evidence that he had a reasonable belief that John Daniels committed or intended to commit a crime in the apartment. Vivian Daniels' testimony regarding the confrontation between John Daniels and the defendant in the apartment was insufficient to establish the second requirement of section 18–1–704.5.

First, the district court must determine whether John Daniels knowingly made an unlawful entry when he entered the defendant's apartment. Second, if the district court finds that John Daniels knowingly made an unlawful entry, the district court must then determine whether the defendant had a reasonable belief that John Daniels committed or intended to commit a crime in the defendant's apartment.

Accordingly, we return this case to the court of appeals with directions to remand to the district court to make findings of facts and conclusions of law consistent with this opinion or for a further or new hearing on the defendant's motion to dismiss.[20]

ROVIRA, C.J., concurs in the result and dissents to part IV.

SCOTT, J., dissents.

Chief Justice ROVIRA concurring in the result and dissenting to Part IV:

I concur in the result reached by the majority but dissent to the conclusion that "unlawful entry" means a knowing, criminal entry into a dwelling. A sounder conclusion, based on the criminal code, would be to define "unlawful entry" as an entry into a dwelling in violation of criminal law.

I

At the outset I believe we should first consider the meaning of the phrases "unlawful entry" and "uninvited entry" in the "make-my-day" statute. Ambiguity arises from the General Assembly's use of both phrases in section 18–1–704.5(2).[1] It is unclear whether to satisfy the statute an entry must be only unlawful, unlawful and uninvited, or either unlawful or uninvited.

The court of appeals concluded that the two terms were interchangeable. *People v. McNeese*, 865 P.2d 881, 884 (Colo.App.1993). I disagree with that court's conclusion that the General Assembly intended an "unlawful entry" to equal an "uninvited entry." I agree with the majority that the phrase "uninvited entry" refers to the "unlawful entry" and should be read as such.[2] *See* Maj. op. at 312 n. 16.

An "unlawful entry" encompasses a broader range of conduct than an "uninvited entry."[3] Although an "uninvited entry" may be some proof that an entry was unlawful, the two are not interchangeable because alone an "uninvited entry" would not fulfill the statutory requirement of an "unlawful entry." *See People v. Malczewski*, 744 P.2d 62 (Colo.1987) (police officer did not unlawfully enter an apartment to take a child into temporary custody even though the officer was uninvited). Therefore, the statute does not require that the entry be both unlawful

---

evidence that John Daniels started the fight by assaulting McNeese.

**20.** The new test adopted in this opinion requires remand for further proceedings.

**1.** Subsection (2) of 18–1–704.5, 8B C.R.S. (1986), provides:

(2) Notwithstanding the provisions of section 18–1–704, any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made *an unlawful entry* into the dwelling, and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling *in addition to the uninvited entry*, or is committing or intends to commit a crime

against a person or property *in addition to the uninvited entry*, and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.
(emphasis added).

**2.** William Wilbanks conducted a study of the Colorado "make-my-day" law and suggested that the references to "uninvited entry" should be changed to "unlawful entry" to avoid confusion. William Wilbanks, *The Make My Day Law: Colorado's Experiment in Home Protection* 340 (1989).

**3.** "Unlawful is a broader term and includes entries that are uninvited as well as forcible but removes the focus on the term uninvited." Wilbanks, *supra* note 2, at 342.

and uninvited or that the entry be either unlawful or uninvited. Rather, the defendant must prove an actual unlawful entry to satisfy the first prong of the statute, *People v. Guenther*, 740 P.2d 971, 979 (Colo.1987), and in addition, establish that he has a reasonable belief that the person who entered has committed a crime in the dwelling, or is committing or intends to commit a crime against a person or property in addition to the unlawful entry.

## II

The question remains as to what constitutes an "unlawful entry." The "make-my-day" statute does not define the phrase. Accordingly, it should be analyzed in context with, and with regard to, its intended purpose evident from the statutory scheme. Because the "make-my-day" statute appears within the Colorado Criminal Code, I believe we should look to the Code for assistance in arriving at the proper definition of "unlawful entry." *Colorado Dep't of Social Serv. v. Board of County Comm'rs*, 697 P.2d 1, 16 (Colo.1985) (statutes which are part of the same code and pertain to the same subject matter must be read in *pari materia* ).

Section 18–4–201(3), 8B C.R.S. (1986), provides a definition of unlawful entry applicable to offenses found in Article 4, Offenses Against Property. It states "[a] person 'unlawfully enters or remains' in or upon premises when he is not licensed, invited, or otherwise privileged to do so."[4] This definition does not contain a culpable mental state of knowingly although offenses containing an "unlawful entry" element may do so. "Unlawful entry" appears in the various degrees of burglary and criminal trespass.[5]

Another offense which includes an "unlawful entry" is an entry into a dwelling in violation of a restraining order. In a domes-

tic situation, a restraining order can be issued to exclude "a party from the home of another party upon a showing that physical or emotional harm would otherwise result." § 14–4–102(1)(e), 6B C.R.S. (1994 Supp.). Section 14–4–105, provides "[a] person failing to comply with any order of the court issued pursuant to this article shall be found in contempt of court and, in addition, may be punished as provided in section 18–6–803.5, C.R.S." Section 18–6–803.5, 8B C.R.S. (1994 Supp.) states "[a] person commits the *crime* of violation of a restraining order if such person commits an act which is prohibited by any court pursuant to a valid order issued pursuant to ... sections 14–1–101 to 14–4–104, C.R.S. ... which restrains and enjoins any person from ... entering or remaining on [a] premises...." (emphasis added).[6] Therefore, entry into a dwelling that violates a restraining order is an unlawful entry.

The majority defines unlawful entry as a knowing, criminal entry into a dwelling. It arrives at this conclusion by first examining the statute's legislative history. It finds support for its inclusion of a knowing mental state because of the references in the debate and hearings that the statute was to protect homeowners against intruders who illegally entered a dwelling, a burglary-type situation. Maj. op. at 310. The majority then infers a knowing requirement because first and second degree burglary require a person to "knowingly enter or remain unlawfully" in a building or occupied structure. § 18–4–202 to –203, 8B C.R.S. (1986).

I do not believe that the General Assembly intended "unlawful entry" to require a "knowing" entry. It could have explicitly provided for a culpable mental state if it so intended. I fail to see how the legislative history relied upon by the majority opinion supports the conclusion that in order to es-

---

4. Under the "make-my-day" statute, a person receives immunity from prosecution for the use of force against a person who unlawfully entered a dwelling and not a person who unlawfully remains in the dwelling. *People v. Drennon*, 860 P.2d 589, 591 (Colo.App.1993).

5. *See* §§ 18–4–202 to –203, 8B C.R.S. (1986) (burglary); §§ 18–4–502 to –504, 8B C.R.S. (1986) (criminal trespass).

6. Justice Scott has expressed concern that the majority opinion's definition of "unlawful entry" does not permit a spouse to protect herself with physical force from an abusive spouse who enters a dwelling by way of a key. Scott, J., dissenting, slip op. at 15. These statutes demonstrate that the spouse could show an "unlawful entry" in this situation entitling her to seek immunity under the "make-my-day" statute.

tablish immunity from prosecution, the homeowner must prove that the intruder had the culpable mental state of "knowing" when he entered the home. One has only to consider the definition of knowingly to recognize that the legislature did not intend to burden the homeowner with this task.[7] The hearings give an example of conduct that could satisfy the statute and do not dictate the only situation in which the statute would grant immunity.

The majority further supports its conclusion by stating

> [t]he statutory language justifies an occupant's use of physical force against another person when the other person is knowingly engaging in criminal conduct.... By providing both objective and subjective elements, the structure of section 18–1–704.5 contemplates that an unlawful entry means a knowing, criminal entry.

Maj. op. at 311. The majority also concludes that immunity was not intended to justify use of physical force against persons who enter a dwelling accidently or in good faith. *Id.* at 311.

This analysis fails both the test of logic and common sense. First, the express language of the statute does not limit the unlawful entry to those entries which are knowing violations of the criminal law. Second, the intruder does not have to *knowingly* engage in criminal conduct in order for an occupant of a dwelling to be immune from prosecution. *See* maj. op. at 311. Rather, the person using physical force must *reasonably believe* a crime has been, is being, or will be committed by the intruder and the intruder will use physical force, no matter how slight, against the occupant. Once an intruder unlawfully enters a dwelling, no additional crime must be committed nor must actual force be used against the occupant of the dwelling. The reasonable belief standard protects the homeowner even if his beliefs are incorrect and a person entered the dwelling by mistake. The majority's analysis improperly shifts the focus from the reasonable beliefs of

the occupant using physical force to the mental state of the intruder.

The original bill, House Bill 1361, required an unlawful and forcible entry. Wilbanks, *supra* note 2, at 31. However, because an occupant of a dwelling was not likely to know whether the intruder entered forcibly or through an unlocked door or window, the "forcible entry" language was removed from the bill. *Id.* at 44. The majority's definition of "unlawful entry" has a similar deficiency. The occupant of a dwelling is not likely to know what an intruder's state of mind is upon entering the dwelling.

I see no reason to add a culpable mental state of knowingly in arriving at a definition of "unlawful entry." The relevant mental state is not that of the intruder, but that of the person who used physical force against the intruder.

The majority indicates that first and second degree burglary and first and second degree criminal trespass may satisfy the "unlawful entry" element. Maj. op. at 311–312. However, under the majority's definition, third degree criminal trespass would not fulfill the "unlawful entry" requirement because it lacks the culpable mental state of knowingly. The third degree criminal trespass statute provides "[a] person commits the crime of third degree criminal trespass if he *unlawfully enters* or remains in or upon premises." § 18–4–504, 8B C.R.S. (1986) (emphasis added). By its silence in not referring to third degree criminal trespass, the majority is holding that a statute which defines a crime as "unlawfully enters" does not satisfy the "unlawful entry" element of the "make-my-day" statute. The logic, or lack thereof, which supports the majority's position further convinces me that the legislature never intended "unlawful entry" to be defined as requiring a culpable mental state.

As to second degree trespass, the majority ignores the fact that it has a knowing requirement for only that portion of the statute

---

7. A person acts "knowingly" or "willfully" with respect to conduct or to circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists. A person

acts "knowingly" or "willfully", with respect to a result of his conduct, when he is aware that his conduct is practically certain to cause the result.
§ 18–1–501(6), 8B C.R.S. (1986).

which refers to a hotel, motel, condominium, or apartment building. § 18–4–503, 8B C.R.S. (1986). It provides "[a] person commits the crime of second degree criminal trespass if he *unlawfully enters* or remains in or upon the premises which are enclosed in a manner designed to exclude intruders or are fenced or if he *knowingly* and unlawfully enters or remains in or upon the premises of a hotel, motel condominium, or apartment building." *Id.* (emphasis added). Therefore, under the majority's analysis only certain types of second degree criminal trespass would satisfy the "make-my-day" statute because its definition of "unlawful entry" turns on a distinction between mental states, and not on the difference between "dwelling" and "premises." Maj. op. at 312 n. 15.

The majority cites *Bollier v. People,* 635 P.2d 543 (Colo.1981), for the proposition that second degree trespass has an implied mental state of knowingly. Maj. op. at 312. The majority also refers to *People v. Moore,* 674 P.2d 354 (Colo.1984) and *People v. Bridges,* 620 P.2d 1 (Colo.1980), to support its conclusion that the court is required to imply a culpable mental state. Maj. op. at 311. *Bollier, Moore,* and *Bridges* implied a mental state because the defendants were being charged with a criminal offense and a mental state was required for a conviction. *Id.* at 546.

The rationale for implying a mental state does not exist in this case. The "make-my-day" statute does not define a criminal offense but provides immunity from prosecution or an affirmative defense. The intruder is not charged with any crime and therefore no mental state is necessary. It is well settled that the legislature may define certain acts as criminal without requiring scienter when public policy dictates it for protection of the public health, safety, and welfare. *People v. Garcia* 189 Colo. 347, 541 P.2d 687 (1975) (no scienter necessary for fourth degree arson because control of fire is a matter of great public concern).

I believe the General Assembly intended an "unlawful entry" to mean an entry in violation of criminal law. I do not agree that the Assembly intended to limit "unlawful entry" to a select few offenses which contain a requirement that an entry be a knowing, criminal entry. Because I believe my interpretation more accurately reflects the legislature's intent, I dissent from so much of Part IV as holds to the contrary.

Justice SCOTT dissenting:

The "make-my-day" statute was most certainly intended to immunize homeowners who exercise their constitutional right to bear arms in self-defense of person and home. In accordance with that statute, the use of physical force by a homeowner against an intruder who enters with the intent of causing bodily harm to the homeowner is justified. I believe the majority's conclusion that an intruder who "unlawfully enters" in violation of our criminal code does not commit an "unlawful entry" under the "make-my-day" statute is untenable. Moreover, although its holding today does not disarm homeowners, the majority subjects those acting in self-defense of their person and home to the very liability that our General Assembly sought to avoid. Accordingly, I dissent.

In 1985, the Colorado General Assembly enacted and Governor Lamm signed into law "The Home Protection Bill."[1] In material part, that statute provides:

**Use of deadly physical force against an intruder.** (1) The general assembly hereby recognizes that the citizens of Colorado have a right to expect absolute safety within their own homes.

(2) Notwithstanding the provisions of section 18–1–704, any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made an unlawful entry into the dwelling, and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling in

---

1. The original bill was entitled "The Home Protection Bill." The name "make-my-day" is a nickname which emerged for this bill during the course of its adoption. Since the majority uses that label in its opinion, I will do so as well; however, I will also refer to that statute as "the Home Protection Bill," as its drafters intended.

addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry, and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.

§ 18–1–704.5, 8B C.R.S. (1986). Subsections (3) and (4), not set forth here, grant any occupant of a dwelling using physical force immunity from criminal and civil liability, respectively.

The majority, without justification, limits the grant of immunity otherwise available under our "make-my-day" statute. The majority does so not on the basis of inexorable constitutional or statutory command, but because it relies upon "the consequences of a particular construction in determining the General Assembly's intent." Maj. op. at 310.

The majority reaches its result, however, by avoiding the straightforward language of the "make-my-day" statute. This it does by first declaring the plain language ambiguous. Having done so, the majority then construes the term "unlawful entry" so as to *exclude* certain conduct which has long been described under our criminal code as "unlawfully enters."

The provisions of the Home Protection Bill were crafted to protect homeowners. By avoiding the plain language of the statute and announcing the straightforward terms "ambiguous," I believe the majority fails to give effect to the legislative intent. Moreover, the majority's result does not recognize the homeowner's right to "expect absolute safety" and does not take into account the sanctity of the home.[2] Because the majority relies upon "the consequences" instead of the plain language of the statute and, in the

process, the majority reduces the predictability necessary for the consistent and even-handed interpretation of our criminal code, I cannot join in its opinion and I must dissent from its judgment.

In the final analysis, I object to what I believe amounts to judicial usurpation of legislative authority. Such an exertion of judicial power, I am obliged to suggest, exceeds the limits of our authority as described by our own precedent, and, as I read it, as acknowledged in the majority opinion. Accordingly and as set forth below, I respectfully dissent.

I

Justice Oliver Wendell Holmes once observed: "Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment." *Northern Securities Co. v. United States,* 193 U.S. 197, 400, 24 S.Ct. 436, 486–87, 48 L.Ed. 679 (1904) (Holmes, J., dissenting).

The majority's disposition of this case demonstrates that hard facts, like great cases, make bad law. This is especially so when our long-established principles of statutory construction are abandoned and appellate review is driven by assumptions inconsistent with the trial court's findings.

The facts set forth by the majority require elaboration. The majority relies upon the testimony of Vivian Daniels, when convenient, and considers that same testimony inconclusive when it would otherwise be inconvenient. The majority also disregards the testimony of key witnesses and ignores docu-

2. The Home Protection Bill recognizes the special significance of one's home or dwelling. § 18–1–704.5(1) provides: "[t]he General Assembly hereby recognizes that the citizens of Colorado have a right to expect absolute safety within their own homes." The special nature of the home has long been recognized in our law. *See, e.g.,* Colo. Const. Art. II, § 7 ("The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures."); Colo. Const. Art. II, § 13 ("The right of no person to keep and bear arms in defense of his home ... shall be called into question."); *Hoffman v. People,* 780 P.2d 471, 475 (Colo.1989) (Residential dwellings have been "given protection as a place where the occupants have a reasonable and legitimate expectation of privacy" because they harbor the "intimate activity associated with the 'sanctity of a person's home and the privacies of life.' ") (citing *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)); *Henderson v. People,* 879 P.2d 383, 389 n. 5 (Colo.1994) (same).

mentary evidence relied upon by the trial court.[3] For example, Steve Underwood, one of John Daniels' friends, testified that immediately before the incident, Vivian Daniels told John Daniels that McNeese "tried to rape her." Underwood testified that in response John Daniels stated, "well, let's go kill [McNeese]," [4] at which point John Daniels, with encouragement from Wessels and in the company of Vivian Daniels and Wessels, left to visit McNeese, at 2:30 a.m.

Although the majority finds on its reading of the record that "John Daniels told Vivian Daniels that there would be no violence," maj. op. at 307, no such findings of fact were made by the trial court. Moreover, the majority concludes on its own reading of the testimony of Vivian Daniels and nothing more, that John Daniels' sole purpose for the visit was to get Vivian Daniels' clothes and possessions from McNeese's apartment. *Id.* This conclusion the majority reaches despite Underwood's testimony that John Daniels stated his intent to "go kill" McNeese. The majority's conclusion is also inconsistent with the testimony of *all* the witnesses that Daniels and Wessels, while legally intoxicated, walked to McNeese's apartment after 2:00 a.m., "on a cold, snowy night." *See* maj. op. at 306.

3. Vivian Daniels was not the only witness on which the trial court relied, although she was the only witness to the actual altercation between McNeese and John Daniels. The trial court also relied upon the testimony of Armedia Gordon, a Denver police homicide unit sergeant who responded to the scene, Steve Jones, the treating paramedic who tended to McNeese after the assault, and Steve Underwood.

4. Underwood's sworn testimony is consistent with his signed statement comprising part of a police report admitted into evidence.

5. Based on its first-hand evaluation of the evidence, the trial court made the following findings of fact: "I do believe that the evidence here establishes a third degree assault ... and that ... *John Daniels ... knowingly or recklessly caused bodily injury to [McNeese]....* The bodily injury here ... means physical pain...."

6. The majority appropriately quotes the "prior comments" or threats of John Daniels: "[L]et's go kill that fuckin' nigger." However, the racial slur aside, a statement of intent to kill or harm

The majority next states that "Vivian Daniels testified that neither the defendant nor John Daniels was hurt." Maj. op. at 7. The trial court, however, did find that "John Daniels ... knowingly or recklessly caused bodily injury to [McNeese]" and committed a third degree assault.[5]

Having observed the demeanor of the witnesses and having reviewed all the evidence, the trial court *did* make sufficient findings to conclude that John Daniels, accompanied by Wessels and Ms. Daniels, entered McNeese's home with the intent to inflict bodily injury upon McNeese:

[T]aken together with the victim's, John Daniels, *prior comments in going to* [McNeese's home] and taking it in the context of Mr. Daniels appearing to act to some degree in defense of Ms. Vivian Daniels, plus to some degree his reputation for being rowdy and willing to fight, leads me to the conclusion that, in fact, Mr. Daniels did inflict a third degree assault upon the defendant, Mr. McNeese.

(Emphasis added.) In essence, then, the trial court found that, consistent with his expressed intent or "prior comments," [6] John Daniels, in effect, committed a burglary and a second or third degree criminal trespass: he entered the dwelling with the intent of causing McNeese bodily harm.[7]

another alone is sufficient evidence of John Daniels' mental state upon entering McNeese's apartment.

7. I find that the conduct of the intruder, as found by the trial court, is sufficient to meet the elements of second degree burglary and second and third degree criminal trespass. As a consequence, I conclude that the intruder, John Daniels committed an unlawful entry. In Colorado, in order to be found guilty of second or third degree criminal trespass, a person must "unlawfully enter[] ... upon [the] premises of another." §§ 18–4–503 and 18–4–504, 8B C.R.S. (1994 Supp.). In order to be found guilty of second degree burglary, a person must "knowingly ... enter[], or remain[] unlawfully in a building or occupied structure with intent to commit therein a crime against a person or property." § 18–4–203, 8B C.R.S. (1994 Supp.). Here, the trial court found that John Daniels entered into McNeese's home with the intent to assault him or commit a crime therein. Thus, I would find that the trial court did make a determination, although not characterizing it as such, that John Daniels' entrance into McNeese's home constitut-

## II

It should now be beyond peradventure that by its passage of the "make-my-day" statute, the General Assembly adopted as the public policy of this state that every citizen of Colorado has "a right to expect absolute safety within [his or her] own home[ ]." § 18-1-704.5(1). In *People v. Guenther*, 740 P.2d 971 (Colo.1987), we did not suggest that the statute was ambiguous. Instead we concluded that under the Home Protection Bill the legislature, as it is empowered, created an immunity from civil and criminal liability for homeowners who use physical force in self-defense when confronted by intruders within their dwellings. *Id.*

When called upon to construe a statute, we are duty bound to ascertain and give effect to the intent of the General Assembly. Maj. op. at 310; *Rowe v. People*, 856 P.2d 486, 489 (Colo.1993); *Guenther*, 740 P.2d at 971. To determine that intent, "we *first* look to the plain language of the statute," maj. op. at 310 (emphasis added), giving the statutory terms used by the General Assembly "their commonly accepted and understood meaning." *Guenther*, 740 P.2d at 975 (citing *Binkley v. People*, 716 P.2d 1111, 1113–14 (Colo.1986); *People v. District Court*, 713 P.2d 918, 921 (Colo.1986); *Engelbrecht v. Hartford Accident & Indemnity Co.*, 680 P.2d 231, 233 (Colo.1984)). As Chief Justice John Marshall admonished in 1820, long before Colorado courts set about interpreting legislative enactments, we begin with the following premise:

> [T]he intention of the law-maker must govern in the construction of … statutes…. [L]aws … are not to be construed so strictly as to defeat the obvious intention of the legislature. *[Courts must not] narrow the words of the statute to the exclusion of cases which those words, in their ordinary acceptance, or in that sense in which the legislature has obviously used them, would comprehend.* The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is not room for construction.

*U.S. v. Wiltberger*, 18 U.S. 76 (5 Wheat) 95–96 (1820) (emphasis added).

### A

While I agree with the majority that by use of the phrase "the uninvited entry" the General Assembly meant the "unlawful entry,"[8] I cannot agree with the majority's conclusion regarding the meaning of "unlawful entry." The majority holds that "the 'unlawful entry' element [of the "make-my-day" statute] requires an entry in *knowing* violation of the criminal law," maj. op. at 311 (emphasis added), and thus concludes that John Daniels' entry into the apartment was not an "unlawful entry." I disagree. The plain language of the statute, the appropriate starting point, makes clear the General Assembly intended that the entry be one of general and not specific intent. I submit that the legislature intended "unlawful entry" to include any criminal entry, including that of an intruder who, although gaining access by the use of a key, enters with the intent of harming an occupant and assaults the homeowner. The majority's reading into the statute a requirement of a *"knowing"* unlawful entry is at odds with the plain language of the statute. One can only assume that if the General Assembly had intended to limit "unlawful entry" to "knowing" violations of the criminal code, it would have so indicated. Relying upon the words employed, it would not be logical to assume that to commit an "unlawful entry" an intruder's entry must be "knowing."[9]

When a statute does not define a crime in terms of a requisite specific intent, it may be

---

ed the crimes of burglary and second and third degree criminal trespass.

**8.** The threshold issue in this case is whether the entry was "unlawful," not whether it was "uninvited." I submit that the legislature's use of the phrase "the uninvited entry" was simply a means to reference the "unlawful entry," and thus "uninvited entry" need not be defined separately.

**9.** The majority's interpretation of "unlawful entry" is also inconsistent with Wayne R. LaFave & Austin V. Scott, Jr., *Substantive Criminal Law* (1986 & 1995 Supp.), a source it cites for authority on this subject. Maj. op. at 18 n. 14. LaFave and Scott note the connection between "unlawfully" and "trespass," for example, *see* LaFave and Scott § 8.13 at 466, a connection clearly at odds with the majority's interpretation.

assumed that the General Assembly intended the omission of specific intent and that the crime is one of general intent. *People v. Schuett*, 833 P.2d 44, 49 (Colo.1992). The distinction between general intent and specific intent is well recognized and of long standing in the field of criminal law. *Armijo v. People*, 157 Colo. 217, 219, 402 P.2d 79, 80 (1965). While general intent may be used to encompass all forms of the mental state requirement, including the general notion of *mens rea*, specific intent is usually used to designate a special mental element which is required above and beyond any mental state required with respect to the *actus reus* of a crime. Wayne R. LaFave & Austin W. Scott Jr., *Criminal Law* § 28 (1972). Where a statute defining a crime includes a specific intent as an ingredient of its criminality, such specific intent is essential and must be established with the same certainty as any other element of the crime. *Armijo*, 157 Colo. at 219, 402 P.2d at 80. Because specific intent crimes necessarily require a greater showing of proof and specificity than general intent crimes, the requirement of specific intent may not be implied or inferred where it is not otherwise required for a criminal offense.

I agree with the majority that legislative silence as to the element of intent is not generally construed to be an indication that no mental state is required. Maj. op. at 311. I disagree, however, with the specific element of intent assigned to the statute by the majority. If an element of intent is to be inferred where a statute is otherwise silent, it should be general rather than specific. *People v. Schuett*, 833 P.2d 44, 49 (Colo.1992). We noted in *Schuett* that the General Assembly declared all offenses defined in the Colorado Criminal Code which have a culpability requirement of "knowingly" to be general intent crimes. *Id.* In this case the majority has asserted that the culpability requirement of "knowingly" can be implied to exist as an element of the "make-my-day" statute. Maj. op. at 311. The majority's use of the term "knowing," however, is as a specific intent element rather than a general intent element. Hence, the majority has created a separate, specific intent element whereby immunity may not be granted to a homeowner unless the intruder possessed the specific conscious objective of unlawfully entering, contrary to our holding in *Schuett* and the intent of the General Assembly.[10]

Section 18–1–704.5(2), the statute we are to apply today, provides: "any occupant of a dwelling is justified in using any degree of physical force against another person *when that other person has made an unlawful entry* into the dwelling. . . ." (Emphasis added.) The language of the statute, i.e., "when that other person has *made* an unlawful entry," speaks only of the intruder's conduct and not, as the majority presupposes, the intruder's intent. The statutory text—which focuses on the conduct of the intruder and not the intruder's intent—precludes an analysis based upon the *mens rea* of the intruder. And where a statute is silent as to a particular *mens rea*, general intent or willful conduct suffices. *Schuett*, 833 P.2d at 49.

By its conclusion that an unlawful entry means "a *knowing*, criminal entry into a dwelling," maj. op. at 310 (emphasis added), the majority construes the term "unlawful entry" in a fashion inconsistent with prior uses and requiring a *mens rea* not previously associated with "unlawful entry." According to the majority, not all criminal entries constitute an "unlawful entry" under the make-my-day law. For example, the majority's holding excludes certain second degree and all third degree criminal trespasses from the meaning of "unlawful entry," since some second degree and all third degree criminal trespasses do not have a "knowing" *mens rea* requirement. Such an exclusion is illogical in

---

**10.** I agree with the Chief Justice in his opinion concurring in the result and dissenting in part ("concurring opinion") in which he states that the cases cited by the majority are not sufficient authority "to support [the majority's] conclusion that [we] are required to imply a culpable mental state." Rovira, C.J., conc. op. at 317. I also agree that by reading into the statute a "knowing" requirement, the result is to deny home-owners "immunity from prosecution or an affirmative defense." *Id.* The resulting greater liability for homeowners from possible criminal prosecution is at odds with *People v. Moore*, 674 P.2d 354 (Colo.1984), *Bollier v. People*, 635 P.2d 543 (Colo.1981), and *People v. Bridges*, 620 P.2d 1 (Colo.1980), which provide certain criminal defendants with *greater protection* from liability.

light of the fact that third degree trespass by definition requires an unlawful entry. When the "make-my-day" statute was enacted into law, our criminal code provided that a person commits the crime of third degree criminal trespass "if he *unlawfully enters* or remains in or upon premises." § 18–4–504(1), 8B C.R.S. (1986) (emphasis added). Today, after minor amendment, in form only,[11] third degree criminal trespass means one who unlawfully enters. Thus, any entry onto premises which constitutes third degree trespass must by definition also constitute an unlawful entry.

Unlike the majority, I find the language of the statute not ambiguous and thus find no "room for construction." Furthermore, the legislative history confirms that the plain language fulfills the legislative intent.

## B

The majority's severe limitation on the meaning of "unlawful entry" finds no support in the plain language of the statute or in the legislative history. I agree with the majority that in the debates and hearings the legislature considered many hypothetical scenarios involving "an illegal entry into a home by a stranger in the middle of the night." Maj. op. at 310. There is no evidence in the debates, however, that the General Assembly intended the statute to apply *only* to such situations. In fact, the legislative debates indicate that the General Assembly was also concerned that homeowners might be held accountable when they act in defense of their home and families where the entry was not criminal. This concern is evidenced by the many scenarios set forth in the debates involving the unexpected entry into the home by a visiting relative.[12] Furthermore, by its subsequent deletion of an exception from im-

munity when force is applied against family and household members, the General Assembly evinced its intent to provide broad protection from liability to homeowners, even when acting in error.[13] As stated during the debates, "every benefit of the doubt should be given to the homeowner." *Hearing on H.B. 1361 Before the House Judiciary Committee* 55th Gen.Assembly, First Reg.Sess. (hearing tape, March 7, 1985, at 5:25 p.m.).

While I agree with the majority that "the statute was not intended to encourage arbitrary, casual killings," maj. op. at 17, I believe it was not intended to encourage *any* killings. I also believe, however, as its original name—"The Home Protection Bill"—suggests, the statute was intended to protect homeowners.

During the legislative debates, it was asserted, without contention, that the Home Protection Bill was consistent with the constitutional right to keep and bear arms. *See Hearing on H.B. 1361 Before the Senate Conference Committee* 55th Gen.Assembly, First Reg.Sess. (hearing tape, May 22, 1985, at 8:07 a.m.) (adoption of the make-my-day law "follows the Colorado Constitutional right to use force in defense of one's home") (statement of Representative Don Mielke, a sponsor of the Home Protection Bill). We have frequently held that where the language of the constitution is plain and its meaning clear, that language must be enforced as written. *See, e.g., Evans v. Romer,* 882 P.2d 1335, 1352 (Colo.1994) (Scott, J. concurring) (citing *Colorado Ass'n of Public Employees v. Lamm,* 677 P.2d 1350, 1353 (Colo.1984)), *cert. granted,* —— U.S. ——, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995). Article II, section 13 of the Colorado Constitution provides:

**Section 13. Right to bear arms.** The right of no person to keep and bear arms

---

**11.** As amended, § 18–4–504, 8B C.R.S. (1994 Supp.), now provides that "[a] person commits the crime of third degree criminal trespass if such person unlawfully enters or remains in or upon the premises of another."

**12.** For example, a typical hypothetical about which the legislators were concerned involved "Aunt Martha," who had her own key and appeared unexpectedly in the middle of the night. *See, e.g., Hearing on H.B. 1361 Before the House Judiciary Committee* 55th Gen. Assembly, First

Reg. Sess. (hearing tape, March 7, 1985, at 5:25 p.m.).

**13.** The original bill precluded the use of deadly force against anyone who was a member of the "family" or "household" of the person using the deadly force. The final version of the bill, however, referred only to "another person" and thus did not distinguish between family members and others.

in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

Only several months ago, a time too recent to be called history, we held that "[t]he right to bear arms is guaranteed under article II, section 13 of the Colorado Constitution." *Robertson v. City and County of Denver*, 874 P.2d 325, 327 (Colo.1994). We noted that, unlike the more narrow constitutional provisions of other states that "merely ... guarantee the collective or 'state's right' ... for maintenance of the militia," the right created by our constitution was intended to allow citizens "to bear arms for purposes of self-defense and the defense of property." *Id.* at 327–28 n. 6. Although we did not determine whether the right of individuals to bear arms in self-defense [14] "is or is not a fundamental right," *id.* at 341 (Vollack, J., concurring), we did conclude that "it is clear that this right is an important constitutional right." *Id.* at 328. The "make-my-day" statute is consistent with and was adopted in furtherance of the exercise of that right.[15]

Noting the Home Protection Bill's symmetry with article II, section 13 of our state constitution, the sponsors called on members of the General Assembly to limit both public and private efforts that might otherwise interfere with the exercise of the right to bear arms in self-defense. *Hearing on H.B. 1361 Before the Senate Conference Committee* 55th Gen.Assembly, First Reg.Sess. (hearing tape, May 22, 1985, at 8:07 a.m.). In the absence of permissible legislative action regulating an important constitutional right, we are not justified or empowered to deny to our citizens the reasonable exercise of that right. Moreover, as here, once the General Assembly has acted to further the exercise of an important constitutional right, we are not

authorized to ignore the statutory command and prohibit the exercise of that right. Nor can we "disarm any class of persons or deprive them of the right guaranteed under section 13, article II of the Constitution, to bear arms in defense of home, person and property." *Robertson*, 874 P.2d at 328 (quoting *People v. Nakamura*, 99 Colo. 262, 264, 62 P.2d 246, 247 (1936)).

### C

Although not necessary, in my view, for resolution of this case nor to affirm the courts below, I believe the General Assembly did not intend that "unlawful entry" be limited solely to violations of our criminal code. Black's Law Dictionary defines "unlawful" as "broad enough to include [criminality]" and "unlawful act" as "not confined to criminal acts."

> **Unlawful.** That which is contrary to, prohibited, or unauthorized by law.... The ... [t]erm is equivalent to "without excuse or justification." *State v. Noble*, 90 N.M. 360, 563 P.2d 1153, 1157. While necessarily not implying the element of criminality, it is broad enough to include it....

> **Unlawful act.** Act contrary to law, and presupposes that there must be an existing law. A violation of some prohibitory law and includes all willful, actionable violations of civil rights, and is not confined to criminal acts. *State v. Hailey*, 350 Mo. 300, 165 S.W.2d 422, 427.

Black's Law Dictionary 1536 (6th ed. 1990). Black's Law Dictionary also defines "unlawful entry" more broadly than the standard imposed by the majority as a "willful" rather than "knowing" act:

> **Unlawful entry.** An entry upon lands effected peaceably and without force, but which is without color of title and is accom-

---

**14.** We characterized art. II, section 13 as the "right to bear arms in self-defense." *Robertson*, 874 P.2d at 328 n. 7.

**15.** While in *Robertson* we held that "the right to bear arms *may* be regulated by the state under its police power in a reasonable manner," *Robertson*, 874 P.2d at 331, the prosecution makes no claim and certainly could not argue that the state

has acted to limit or regulate the right to bear arms in self-defense. To the contrary, under the "make-my-day" statute, the state has not only elected *not* to limit that right but, in fact, has acted in furtherance of its exercise, as evidenced from the legislative debate regarding the "make-my-day" statute.

plished by means of fraud or some other *willful* wrong.

*Id.* at 1537 (emphasis added).

Such a definition as I would adopt, including all conduct of wrongful entry chargeable as a crime, is familiar to our legislature. The General Assembly has frequently used the term "unlawful" to describe prohibited conduct that does not constitute a violation of our criminal code. For example, section 42–4–1001, 17 C.R.S. (1989 Supp.), dealing with speed regulations, uses the term "unlawful" outside of the criminal context. That statute indicates that "the conduct of a driver of a vehicle which would otherwise constitute a violation of this section is justifiable and not unlawful" under certain enumerated circumstances. § 42–4–1001(8)(a). By implication, absent those special circumstances, conduct in violation of the motor vehicle code is "unlawful." Yet, that same conduct which is "unlawful" under our motor vehicle code is not a crime under our criminal code. Other examples of the General Assembly's use of the term unlawful to describe conduct not constituting a crime are plentiful. *See, e.g.,* § 10–4–708.6(1)(III)(b), 4A C.R.S. (1994) ("It shall be unlawful for any health care practitioner, provider of benefits, organization, or any other person to do any of the following...."); § 42–3–106(2), 17 C.R.S. (1993 & 1994 Supp.) ("It is unlawful for any owner of any vehicle to permanently attach to such vehicle any mounted equipment....").

On more than one occasion, this court has concluded in construing our statutes, that an unlawful act is not necessarily criminal. *See, e.g., Jet Courier Service, Inc. v. Mulei,* 771 P.2d 486, 502 (Colo.1989) (breach of duty of loyalty satisfies the unlawful act element of the civil conspiracy definition); *McGlasson v.*

*Barger,* 163 Colo. 438, 442–43, 431 P.2d 778, 780 (1967) (civil conspiracy has been defined as two or more persons who seek to accomplish some lawful purpose by criminal *or* unlawful means). Furthermore, our courts have held that an entry made after license has been given is not necessarily lawful. *See People v. Ridenour,* 878 P.2d 23 (Colo.App. 1994) (where defendant entered a theater office which a reasonable person would believe was closed to the public, entry was unlawful despite any limited license previously granted).

I fear that the majority's limited interpretation of the statute's plain language places in jeopardy many citizens the General Assembly intended to immunize, such as people protected by restraining orders. We have held that by breaching a restraining order, a defendant can be held in either civil or criminal contempt. *See, e.g.,* C.R.C.P. 107; *People v. Allen,* 868 P.2d 379, 383 (Colo.1994) (even a legal act which constitutes disobedience of a court's order may provide the basis for a finding of contempt); *City of Colorado Springs v. Blanche,* 761 P.2d 212, 215 (Colo. 1988) (defendants found in civil contempt for violation of temporary restraining order).[16] There can be little doubt that the General Assembly intended the "make-my-day" statute to reach situations involving other family or household members as intruders when, in response to legislative debate, an exclusion for family and household members was dropped from the legislation.[17] Thus, the immunity was designed to include a situation where an abusive husband, who has been ordered by the court not to contact his wife, enters the home of his wife if such entry violates a restraining order. The husband's

**16.** Although as of the first of this year a violation of a court order is a crime, § 18–6–803.5, 8B C.R.S. (1994 Supp.), at the time the "make-my-day" statute was adopted, it was not.

**17.** The original bill as proposed precluded the use of deadly force against anyone who was a member of the "family" or "household" of the person using the deadly force. The final version of the bill adopted into law, however, refers only to "another person" and thus does not distinguish between family members and others. *See* William Wilbanks, *The Make My Day Law: Colorado's Experiment in Home Protection* 40–41, 92

(1989). This significant change was presumably an effort to provide broader protection for the homeowner. During the legislative debates prior to this change, members of the General Assembly expressed concern as to homeowners who might, by mistake, apply force against a family or household member who had a key or otherwise entered the home in an unusual or unexpected manner. Such debates and the consequent change dropping the exclusion suggest strongly that the General Assembly intended to protect homeowners when the intruder did not violate our criminal code.

entry, even into a home he owns in joint tenancy with his wife, with the use of his own key, might not have been in violation of our criminal code, yet still may have caused the wife to reasonably fear for her physical safety. If justified by the intruder's actions after the unlawful but not criminal entry, the wife may apply force, even deadly force, to defend herself. Just as in that case where the wife's use of force to protect herself in her husband's home would be justified, so was McNeese's use of force in the case at bar.

## D

Finally, even under the majority's definition, I find that John Daniels' entry into McNeese's home constituted an unlawful entry. I submit that when John Daniels entered McNeese's home he knowingly committed a criminal trespass.

Generally, *in the absence of any restriction in the agreement between the landlord and the tenant,* the tenant has the right to invite whomever he or she so desires upon the premises. *See* 49 Am.Jur.2d (Landlord and Tenant) § 235 at 251. One who comes upon the premises in violation of a restriction in the lease agreement, however, commits a criminal trespass. *See id.* at 251–52. Since John Daniels was aware of a restriction in the lease agreement between McNeese and Vivian Daniels, his entrance upon the premises was a knowing, criminal trespass.[18]

The majority presumes that the lease agreement is nullified because Vivian Daniels personally invited John Daniels onto the premises. Generally, consent to enter the premises given by the owner, occupant, or other authorized person has been recognized as a valid defense to an unlawful entry. Privilege to be within the premises is negated, however, by the formation of criminal intent, or the undertaking of criminal actions therein. *See, e.g., Id.* at 251; *People v. Fisher,* 83 Ill.App.3d 619, 39 Ill.Dec. 268, 404 N.E.2d 859 (1980) (since the defendants were given authority to enter the apartment for the purpose of a social visit only, the court declared that the criminal actions they planned were inconsistent with the limited authority, and served to vitiate the consent given for their entry).

In this case, John Daniels was not authorized to enter the premises because of the sublease agreement. Furthermore, Vivian Daniels' authority to invite John Daniels onto the premises only allowed her to invite him on the premises *for lawful purposes.* Since John Daniels entered McNeese's apartment for the unlawful purpose of physically harming McNeese, any permission he may have secured by Vivian Daniels would be negated. Therefore, his entry onto McNeese's property in violation of the sublease agreement would constitute a criminal trespass and thus an unlawful entry.

In holding that the entry in this case was not unlawful, the majority undertakes a venture in judicial legislating, vitiating the intent of the General Assembly. By its holding, the majority suggests the only recognition that should be given to the "make-my-day" statute is unfulfilled because the immunity otherwise guaranteed homeowners is denied. In its place, as suggested by the majority, we are left to find a new affirmative defense, a result that rejects the clear public policy adopted by our General Assembly.

## III

There are two misfortunes created by the majority's holding today. The first is that the legislative intent is not fulfilled. The second, often less noticed, is the decision creates uncertainties and the loss of predictability in our law, a harm caused here because the majority has deferred to "the consequences of a particular construction," rather than the plain language, for its result. Predictability is one of the benefits of consistently applying settled rules of statutory construction. It is an attribute especially important when interpreting our criminal code. Unanticipated deviations in any case not only result in a disservice to the parties before the court, but also create uncertainty and future

---

**18.** Two different lease agreements are implicated in this case: one is the original lease between Robert McNeese and his landlord; the other is the sublease agreement between McNeese and Vivian Daniels. In this instance, we are referring to the sublease agreement.

difficulty among lower courts obliged to follow the precedent we create.

In like regard, citizens need to know under what circumstances they can use force in self-defense to protect their homes and, in general, what conduct subjects them to criminal prosecution. Based upon the majority's determination as to what constitutes an "unlawful entry," citizens are placed in peril whenever they are confronted by our criminal statutes which fail to specify the culpable mental state necessary to commit a crime. Because under its rationale a knowing or lesser intent can easily be read into or out of the statute, the majority's judgment presages the destruction of predictability in our criminal code and the inherent due process issues raised thereby.

Here, if the legislature actually intended a "knowing" requirement, the statute is vague, since it does not provide sufficient guidance to that effect and no reasonable reader could anticipate such a requirement. I submit instead that the statute is not vague—any reasonable reader would assume that the General Assembly intended "unlawful entry" to encompass at a minimum all conduct by which one "unlawfully enters" the home of another in violation of the criminal code. Such a definition of "unlawful entry," I believe, was intended by the General Assembly.

## IV

The majority concludes that the evidence in the record was insufficient to establish that John Daniels committed a crime in the dwelling or was committing or intended to commit a crime against a person or property in addition to an unlawful entry. Maj. op. at 313–314 n. 19. The majority bases its conclusion on its view that the only testimony to establish what occurred in the apartment was presented by Vivian Daniels and her testimony was "insufficient to establish that John Daniels committed a third degree assault on the defendant." *Id.*

The majority here is engaging in an exercise of choosing facts which will support its position. That is, the majority chooses to rely heavily on the testimony of Vivian Daniels when her testimony supports its position, *see, e.g.,* maj. op. at 307, but then finds that her testimony was insufficient to establish that John Daniels committed a third degree assault on the defendant. Maj. op. at 313–314 n. 19. In so holding, the majority ignores the clear findings of the trial court based upon the judge's determination of the credibility of Vivian Daniels. Nonetheless, unlike the majority, I do not believe the trial court's findings are "based simply on speculation," maj. op. at 313 n. 19, when it concluded that McNeese might reasonably believe John Daniels intended to commit a crime when the facts show: (a) Daniels entered at 2:30 a.m.; (b) Daniels confronted McNeese while McNeese was in bed; (c) Daniels knew he was prohibited from entering; and (d) Daniels assaulted McNeese and threatened bodily harm. I do believe, however, that an intruder's momentary "nonviolent behavior," *id.,* should not trump other acts of violence.

The majority suggests that the findings of the trial court are not binding on this court.[19] I disagree.

Where the findings of the trial court are supported by the record, those findings must be accepted on review unless they are clearly erroneous. *M.D.C./Wood, Inc. v. Mortimer,* 866 P.2d 1380, 1384 (Colo.1994). We are to accept the findings of the trial court when supported by the record for the very reason

---

**19.** The majority states "[t]he *findings of fact* and conclusions of law of the trial judge were based on an erroneous interpretation of the elements that must be proven to obtain immunity under section 18–1–704.5. Accordingly, the findings and conclusions were erroneous as a matter of law and are not binding on this court." Maj. op. at 308 (emphasis added) (citing *People v. Dover,* 790 P.2d 834 (Colo.1990)). The *Dover* case, however, does not stand for that proposition. In *Dover,* we held that the evidence was not sufficient to allow the emergency justification defense to a speeding charge to be considered by the trier of fact. Therefore, the trial court's conclusions of law were not binding on the court. We did not, however, under *Dover,* grant to appellate courts license to disregard a trial court's findings of fact, only its combination of facts and improper legal standards. Here, because the findings alone are sufficient, we can apply the correct standard for an unlawful entry, electing either criminal code violation of third degree trespass, § 18–4–504(1), or second degree burglary, § 18–4–203.

that a trial court is especially well positioned and better able than appellate courts to determine the credibility of witnesses. *University of Colorado v. Derdeyn*, 863 P.2d 929, 938 (Colo.1993). We have consistently disapproved of the substitution of new factual findings by reviewing courts for those made by the trial court. *Page v. Clark*, 197 Colo. 306, 313, 592 P.2d 792, 796 (1979). Where the record clearly supports the findings of the trial court, it is inappropriate to allow a reading of a transcript, accepting all statements of a witness as true, to serve as a basis for rejecting credibility determinations implicit in the trial court's factual determinations. *People v. Dover*, 790 P.2d 834, 835 (Colo.1990).

The trial court's finding that John Daniels entered McNeese's home with the intent to cause him harm and that he did, in fact, commit an assault against the defendant once in the home, was supported by the testimony of John Daniels' wife, Vivian Daniels and other witnesses, including Steve Underwood, paramedic Steve Jones, and Detective Gordon. Evidence admitted without objection indicated that, upon being informed by Vivian Daniels that McNeese attempted to rape her, John Daniels immediately stated, "well, let's go kill that fuckin' nigger," [20] and went to McNeese's apartment, after 2:00 a.m., to cause him harm. Ms. Daniels testified that after their unannounced entry in the apartment, she witnessed John Daniels applying a "chokehold" on the defendant. She then heard John Daniels say to the defendant, "if you ever hurt her I will kill you." Based on the evidence, the trial court concluded that the victim, John Daniels, committed a third-degree assault upon the person of the defendant. As stated by the court of appeals:

> [T]he decedent had inflicted a third degree assault upon the defendant by putting him in a headlock, which when considered in the context with decedent's death threat against defendant, plus his reputation for being rowdy and combative, established a basis for a reasonable belief that he had committed, was committing, or would commit a crime in the apartment.

*People v. McNeese*, 865 P.2d 881, 883 (Colo. App.1993).

It must be noted that even if we ignore the specific findings of the trial judge that John Daniels committed a third degree assault upon McNeese, it does not negate the fact that the defendant had a reasonable belief that John Daniels committed or intended to commit a crime in the defendant's home. In addition to Ms. Daniels' testimony regarding the "chokehold," there is uncontroverted evidence that the defendant knew that John Daniels was a dangerous man who could potentially focus his aggressions on the defendant. Ms. Daniels admitted that she had previously informed the defendant that John Daniels was violent when he drank and that he had previously killed a man while intoxicated. Despite the majority's opposite conclusion, I believe it only reasonable for the defendant to expect that John Daniels, who was prohibited from entry, who suddenly appeared and confronted the defendant after 2:00 a.m. while McNeese was in bed, and who had applied a "chokehold" and verbally threatened bodily harm, *might* attempt to commit a crime against him.

The trial court made its factual determinations regarding the credibility of each witness with the benefit of having observed the demeanor of each witness. Undoubtedly the trial court weighed all testimonial and other evidence before reaching its conclusions. Perhaps it would have been more desirable for the trial court to have made specific factual findings and to have more clearly set forth both its findings of fact and conclusions. However, under the circumstances and without the benefit of our collective, deliberative analysis, I find the trial judge's findings sufficient for us to determine John Daniels' entry was unlawful and thus those findings should be upheld.

The record supports the findings of the court. Because it is an established policy of this court that the factual findings of trial courts must be accepted on review unless they are clearly erroneous, I believe we are

---

**20.** Although Vivian Daniels testified she did not *hear* John Daniels' "prior comment," Ms. Daniels did not deny the testimony of Steve Underwood that the statement was made immediately before Daniels left to pay his 2:30 a.m. visit on McNeese.

bound by the trial court's determinations of fact, regardless of whether we would resolve the factual dispute otherwise.

## V

In holding that the entry in this case was not an "unlawful entry," the majority undertakes a venture in judicial legislating, vitiating both the intent of the General Assembly and the immunity otherwise guaranteed homeowners who bear arms in self-defense. The record here will support a conclusion that John Daniels entered the defendant's home intending to cause him harm and in violation of our criminal code. Immunity for a homeowner who applies force against a criminal entrant, the very circumstances here, was contemplated by our "make-my-day" statute. It is the means by which the General Assembly intended that the right of all citizens "to expect absolute safety within their own homes" is to be met.

Finally, I borrow from Chief Justice Otto Moore, dissenting in *Fellhauer v. People,* 167 Colo. 320, 351, 447 P.2d 986, 1001 (Colo.1968):

I view with deep concern the general trend of the opinion of the majority which, as I perceive it, will tend to create many uncertainties in areas where certainty and stability are most essential.... I am also deeply conscious of the fact that by the judgment of [the other members of this court]—whose earnestness, dedication and sincerity I do not question—my dissenting views are without merit. Nevertheless I have been required by conscience to set them forth for the single reason that although, admittedly, I may be wrong, I am not in doubt.

Accordingly, I would affirm the judgment of the court of appeals.