The **PEOPLE of the State of Colorado,**
**Plaintiff–Appellant,**

**v.**

**Robert Earl McNEESE,**
**Defendant–Appellee.**

No. 92CA0929.

Colorado Court of Appeals,
Div. II.

May 20, 1993.

Rehearing Denied June 17, 1993.

Certiorari Granted Jan. 10, 1994.

Norm S. Early, Jr., Denver Dist. Atty., Nathan B. Coats, Deputy Dist. Atty., Denver, for plaintiff-appellant.

David F. Vela, Colorado State Public Defender, Frances Smylie Brown and Stephen M. Flavin, Deputy State Public Defenders, Denver, for defendant-appellee.

Opinion by Judge TURSI.

The People appeal the trial court's order dismissing charges of second degree murder filed against the defendant, Robert Earl McNeese. After a pretrial hearing, the court dismissed the charges pursuant to § 18-1-704.5, C.R.S. (1986 Repl.Vol. 8B) which provides that, under certain circumstances, an occupant of a dwelling using any degree of physical force against an unlawful intruder shall be immune from criminal prosecution. We affirm.

The People argue that, inasmuch as a joint occupant of defendant's apartment had invited the decedent into the apartment, the trial court erred as a matter of law in holding that the decedent's entry into that apartment was unlawful and uninvited. They further argue that the evidence was insufficient to establish by a preponderance of the evidence that the decedent had committed a crime in the dwelling and that he might use physical force against an occupant. We disagree.

Approximately three months before the incident at issue, a woman acquaintance of defendant had moved into his apartment because she and the decedent, her husband, were not getting along. On the night in question, that woman, after resisting defendant's sexual advances, told him that she was going to move out and defendant agreed with that decision.

During her occupancy, the woman paid defendant $50 per month for rent and slept on the living room couch. She was given a key after she moved in and all her belongings were in the apartment. However, defendant had allowed the woman to stay in his apartment only on the condition that she not allow the decedent to enter the apartment. In this regard, the record demonstrates that the decedent knew he was not allowed entry into the apartment. Indeed, he would wave to his wife from the street rather than knock on the door.

On the night that the woman left the apartment, she left without taking any of her belongings and went to the decedent's home. There, she told the decedent of the advances by the defendant. The decedent, who had been drinking, wanted to get her belongings immediately. After agreeing that there would be no arguing or fighting, the woman, the decedent, and his friend returned to the defendant's apartment around 2:30 a.m. to get her belongings. The woman used her key to let them in.

Once inside, the decedent opened defendant's bedroom door, awakened him, and talked to him from the doorway for about

three minutes. When the woman asked the decedent to come back to the living room and help her get her things, the decedent returned to the living room and the defendant followed him.

The woman testified that, after leaving for a moment, she returned to see the decedent on the couch with a chokehold around the defendant's throat. According to her testimony, the decedent told the defendant, "If you ever hurt her I will kill you." She further testified that the decedent and defendant wrestled on the couch for two to three minutes and that after they stopped, neither of them seemed hurt, and they were not arguing.

At this point, the woman continued gathering her things in the living room. The next thing she said she saw was both the decedent and his friend lying on the floor. Although both bodies lay within a few feet of where she stood, she claimed not to have heard or seen a thing. The defendant then stabbed her in the head with a knife and she ran from the apartment. She testified that the stabbings occurred about twenty minutes after she, the decedent, and his friend entered the apartment, and between five and ten minutes after the wrestling on the couch.

The defendant did not testify, and thus, the woman's testimony is the only direct evidence of what occurred.

Other testimony, however, revealed that, on the night of his death, the decedent's blood alcohol level was .349 grams per hundred milliliters. Also, he was heard telling his friend as they left to go over to the defendant's apartment, "Let's go kill that fucking nigger." The decedent was known for being a violent drunk, for bragging about killing his best friend, and for despising blacks.

In a bench ruling granting defendant immunity from prosecution, the court found that the woman had lawfully returned to the apartment to retrieve her things. The court also concluded that she had lawful authority to invite the decedent's friend into the apartment under these circumstances; however, the court ruled she was without lawful authority to invite the decedent into the defendant's apartment.

The trial court found that the decedent's entry into the apartment was unlawful because the agreement between the defendant and the woman had prohibited an invitation to decedent to enter the apartment under any circumstances.

The trial court further found that the decedent had inflicted a third degree assault upon the defendant by putting him in a headlock, which when considered in context with the decedent's death threat against defendant, plus his reputation for being rowdy and combative, established a basis for a reasonable belief that he had committed, was committing, or would commit a crime in the apartment.

The trial court also found that any person in "the situation of the defendant would easily expect, and ... would be justified in having the fear that the intruder in this case, [the decedent], might use some further physical force against him, the defendant."

The crux of the People's argument on appeal is that the defendant did not establish that the decedent actually entered defendant's apartment unlawfully. The People argue that since the woman occupying the apartment had invited the decedent into the apartment, and had used her key to enter, the decedent was an invited guest, despite the fact that the terms of her tenancy prohibited his admission into the apartment. We disagree.

Section 18–1–704.5, C.R.S. (1986 Repl.Vol. 8B) states in part:

Notwithstanding the provisions of § 18–1–704, any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made *an unlawful entry* into the dwelling, and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling in addition *to the uninvited entry,* or is committing or intends to commit a crime against a person or property in addition to the uninvited entry, and when the occupant reasonably believes that such other person might use

any physical force, no matter how slight, against any occupant. (emphasis supplied)

In *People v. Guenther*, 740 P.2d 971, 981 (Colo.1987), our supreme court interpreted the statute as follows:

The burden is on the defendant seeking the benefit of the statutory immunity to establish by a preponderance of evidence that: 1) another person made an unlawful entry into the defendant's dwelling; 2) the defendant had a reasonable belief that such other person had committed a crime in the dwelling in addition to the uninvited entry, or was committing or intended to commit a crime against a person or property in addition to the uninvited entry; 3) the defendant reasonably believed that such other person might use physical force, no matter how slight, against any occupant of the dwelling; and 4) the defendant used force against the person who actually made the unlawful entry into the dwelling.

■ Our primary task in construing a statute is to ascertain and give effect to the intent of the General Assembly. *Charnes v. Boom*, 766 P.2d 665 (Colo.1988). To discern legislative intent, a court should look first to the statutory language. *People v. Warner*, 801 P.2d 1187 (Colo.1990). Statutory words and phrases should be given effect according to their plain and ordinary meaning and the statute must be read and considered as a whole. *People v. District Court*, 713 P.2d 918 (Colo.1986). It is presumed that the General Assembly has knowledge of the legal import of the words it uses and that it intends each part of the statute to be given effect. *People v. Guenther, supra.*

Had the General Assembly intended to distinguish between *an* unlawful entry and *an* uninvited entry, it would have so done. Instead, § 18–1–704 grants immunity to an occupant who uses deadly force against a person who has made "an unlawful entry" into the occupant's dwelling. The statute then by use of the definite article "the" refers back to the unlawful entry as "the uninvited entry."

■ Here, giving effect to the plain and ordinary meaning of the statutory words and phrases, we conclude that the legislative intent was to use "unlawful entry" and "uninvited entry" interchangeably.

Section 18–4–201(3), C.R.S. (1986 Repl.Vol. 8B) states that: "A person 'unlawfully enters or remains' in or upon premises when he is not licensed, invited, or otherwise privileged to do so." Neither § 18–1–704 nor § 18–4–201 provides for an unlawful invitation.

Furthermore, the People are unable to explain how a lawful entry can be committed by accepting an unlawful invitation. Thus, inasmuch as the woman tenant did not have the authority to invite the decedent to the defendant's apartment, the decedent's entry was both unlawful and uninvited.

■ Finally, the People contend that the evidence was insufficient to establish that the decedent committed a crime in the dwelling and that he might use physical force against an occupant. We disagree.

The district court found that the decedent had inflicted a third degree assault upon the defendant and that it was reasonable for the defendant to fear that the decedent might use some further physical force against him. There is nothing in the record to suggest that the district court erred in this finding.

The judgment is affirmed.

HUME, J., concurs.

TAUBMAN, J., dissents.

Judge TAUBMAN, dissenting.

I respectfully dissent.

The district court found, and the majority here affirms, that the decedent had unlawfully entered defendant's apartment, and the decedent's entry was uninvited because the woman tenant lacked authority to invite him into the apartment. I agree that the decedent's entry was unlawful, but I disagree that the entry was also uninvited. And, because I believe the statute requires both an unlawful *and* an uninvited entry, I would vacate the trial court's order of dismissal and remand for trial.

In all but one respect, I agree with the majority that the facts of this case satisfy the criteria in *People v. Guenther*, 740 P.2d 971

(Colo.1987) for immunity from criminal prosecution under § 18–1–704.5, C.R.S. (1986 Repl.Vol. 8B). I dissent because the unique circumstances here raise a question of statutory interpretation not discussed in *Guenther*.

As noted in the majority opinion, § 18–1–704.5 uses both the terms "unlawful entry" and "uninvited entry." There is no case law which addresses what "uninvited" means in the context of this statute. In *Guenther, supra*, our supreme court interpreted the statute but did not distinguish between the use of the words "unlawful" and "uninvited." Therefore, the precise meaning of those words is a question of first impression here.

Statutory words and phrases should be given effect according to their plain and ordinary meaning and the statute must be read and considered as a whole. *People v. District Court*, 713 P.2d 918 (Colo.1986). It is presumed that the General Assembly has knowledge of the legal import of the words it uses and that it intends each part of the statute to be given effect. *People v. Guenther, supra*. Moreover, a statute should be interpreted to give consistent, harmonious, and sensible effect to all its parts. *People in Interest of D.L.E.*, 645 P.2d 271 (Colo.1982).

Our primary task in construing a statute is to ascertain and give effect to the intent of the General Assembly. *Charnes v. Boom*, 766 P.2d 665 (Colo.1988).

Section 2–4–201, C.R.S. (1980 Repl.Vol. 1B) states in part that: "[I]n enacting a statute, it is presumed that: ... (b) the entire statute is intended to be effective; [and] (c) a just and reasonable result is intended...." Additionally, "[a] court, in interpreting statutory language, is required to give effect to every word, phrase, clause, sentence and section, and cannot presume that the General Assembly used language idly and with no intent that meaning should be given to it." *In re Marriage of Wells*, 850 P.2d 694, 697 (Colo.1993) (fn. 6).

Here, since the General Assembly used the terms "unlawful entry" and "uninvited entry," the above principles of statutory construction would lead us to postulate that each phrase has a distinct meaning. And, in determining whether such was, indeed, the legislative intent, we must look to the plain and obvious meaning of these terms. *People v. Browning*, 809 P.2d 1086 (Colo.App.1990).

In my view, the words "unlawful" and "uninvited" have different plain meanings.

Section 18–4–201, C.R.S. (1986 Repl.Vol. 8B) states that: "[A] person 'unlawfully enters or remains' in or upon premises when he is not licensed, invited, or otherwise privileged to do so." This statutory definition indicates that one who enters premises without invitation necessarily enters unlawfully. However, because of the distinct meaning of the term "uninvited," one may be invited onto certain premises yet be there unlawfully.

Section 13–21–115(5)(c), C.R.S. (1992 Cum. Supp.) defines "invitee" as "a person who enters or remains on the land of another to transact business in which the parties are mutually interested...."

Also, "invitation" has been defined as "a term of considerable breadth, ... [which] may be used to express the relation between an owner or occupier of land and one who comes thereon under certain circumstances." Further, an "invitee" is defined as "one who goes on the premises of another in answer to an expressed or implied invitation of the owner or occupant." 48A C.J.S. *Invitation*. Thus, an "uninvited entry" is simply one without an express or implied invitation of the owner or occupant of certain premises.

On the other hand, "unlawful entry" means "an entry upon lands effected peaceably and without force, but which was without color of title and is accomplished by means of fraud or some other willful wrong." *Black's Law Dictionary* 1706 (rev. 4th ed. 1968). Therefore, a person could be *invited* without color of title or through fraudulent means, and yet enter land unlawfully. Indeed, this may occur when a family member or roommate invites a person onto his or her property, unaware that another family member or roommate has directed that person not to enter the property.

Here, the district court correctly found that the victim's entry was "unlawful," since it violated the provisions of the woman occu-

pant's oral tenancy. However, in my view, the district court erred in concluding that the victim was "uninvited." The woman clearly invited the decedent into the apartment, albeit that she was not authorized to make such an invitation. Indeed, the decedent was an "invitee" under § 13–21–115(5)(c), since he entered property of another to transact business in which he and his wife were mutually interested—removing her belongings from the defendant's apartment.

I disagree with the majority that the statute is clear and that the words "unlawful" and "uninvited" should be used interchangeably. While the statute does refer to "the uninvited entry," suggesting that it refers back to "an unlawful entry," it does not follow that the words mean the same thing. As noted above, under the provisions of § 18–4–201, C.R.S. (1986 Repl.Vol. 8B), all uninvited entries are unlawful. This does not mean that there cannot be invited entries which are also unlawful. In my view, this means that the statute may be ambiguous.

On its face, the statute can be read to mean either that "unlawful" and "uninvited" are the same or that "unlawful" and "uninvited" are different. While I believe the statute is clear based upon the plain meaning analysis above, the statute could be perceived as ambiguous. If it is viewed as ambiguous, we must look to extrinsic aids to interpret it.

Section 2–4–203, C.R.S. (1980 Repl.Vol. 1B) states:

(1) If a statute is ambiguous, the court, in determining the intention of the general assembly, may consider among other matters:

(a) The object sought to be attained;

(b) The circumstances under which the statute was enacted;

(c) The legislative history, if any;

(d) The common law or former statutory provisions, including laws upon the same or similar subjects;

(e) The consequences of a particular construction;

(f) The legislative declaration or purpose.

With respect to § 18–1–704.5, the legislative history makes clear that the words "un-lawful" and "uninvited" were intended to mean two different things. The House bill first introduced referred to "unlawful and forcible" entry while the compromise bill later adopted referred at one point to "unlawful" entry and at two other points to "uninvited" entry. The term "uninvited entry" replaced "forcible entry" in order to give greater protection to homeowners, the principal intent of the legislation. Tape Recording of Legislative Conference Committee on H.B. 1361, 55th General Assembly, 1st Session (May 22, 1985); Wilbanks, *A Report to the Colorado Legislature, the Make My Day Law: Colorado's Experiment in Home Protection,* at 32 (August 1989).

The General Assembly wanted the statute to provide a defense for a homeowner who killed an intruder who might not have forcibly entered. Governor Lamm also voiced concern that the bill as introduced could allow a person to lure another into his home and then "blow him away." Wilbanks, *supra,* at 29. Thus, the General Assembly did not intend that the statute would apply to a person invited into the homeowner's residence.

This reading of the statute also clarifies the ambiguity pursuant to § 2–4–203(1)(a) and (e). While the consequence of this construction is a narrowing of the statutory interpretation, it is consistent with the legislative intent to protect homeowners from unlawful intruders. *Cf. People v. Drennon,* 860 P.2d 589 (Colo.App.1993).

Furthermore, the object sought to be attained by the General Assembly did not include protecting the homeowner when the entrant was an invitee. In his extensive study of § 18–1–704.5, Wilbanks observed instances where the statute had been applied to lawful invitees in a way he did not believe had been contemplated by the General Assembly. To remedy the ambiguity he perceived, Wilbanks proposed a revised statute which, among other things, would substitute the word "unlawful" for "uninvited."

The defendant argues that the entry must be both "unlawful" and "uninvited" for the statute to apply. The district court correctly found that the entry of the decedent was

"unlawful," since it violated the provisions of the woman's oral tenancy with the defendant. However, the district court was mistaken in holding that the decedent was "uninvited." The woman tenant did invite the decedent into the apartment. Despite the fact that she was not authorized to make this invitation, it was still an invitation.

Construing the statute to require both an "unlawful" and "uninvited" entry, I believe the facts of this case require reversal of the district court. Accordingly, I would vacate the order of dismissal and direct reinstatement of the information on remand.