**DEPARTMENT OF TRANSPORTATION, State of Colorado, and Board of County Commissioners of Pitkin County, Petitioners**

v.

**Craig R. STAPLETON, Respondent.**

No. 03SC616.

Supreme Court of Colorado, En Banc.

Sept. 13, 2004.

Ken Salazar, Attorney General, Harry S. Morrow, First Assistant Attorney General, Jennifer L. Mele, Assistant Attorney General, Transportation Unit, Litigation Section, Denver, Colorado, Attorneys for Petitioner Department of Transportation State of Colorado.

John M. Ely, Pitkin County Attorney, Christopher G. Seldin, Assistant County Attorney, Aspen, Colorado, Attorneys for Petitioner Board of County Commissioners of Pitkin County.

Faegre & Benson, LLP, Leslie A. Fields, John R. Sperber, Patrick T. Madigan, M. Patrick Wilson, Denver, Colorado, Attorneys for Respondent.

Carolynne C. White, Denver, Colorado, John P. Worcester, City Attorney, Aspen, Colorado, Attorneys for Amicus Curiae Colorado Municipal League and City of Aspen, Colorado.

Justice RICE delivered the Opinion of the Court.

The Petitioners, the Colorado Department of Transportation (CDOT) and the Board of County Commissioners of Pitkin County (the "County"), seek review of the court of appeals' decision that they each lack statutory authority to condemn property owned by the Respondent, Craig R. Stapleton. Because we find that CDOT has the necessarily implied statutory authority to condemn the property at issue, we reverse.

## I. Facts and Proceedings Below

This case arises out of a condemnation action in which the trial court awarded the Petitioners immediate possession of property owned by the Respondent and located near the Buttermilk Ski Area outside the city of Aspen. The Petitioners had brought a joint condemnation action in which they sought to acquire certain parcels for their independent but overlapping needs.

Prior to the condemnation action, CDOT and the County had entered into an Intergovernmental Agreement (IGA) which addressed various long-term and short-term needs of both CDOT and the County. In particular, the IGA covered the reconstruction of State Highway 82, which included a partial expansion from two lanes to four lanes and consolidation of the three existing accesses to the highway into one single access point. The project further provided that Highway 82 would remain as a two-lane highway at a point outside of Aspen, across from the Buttermilk Ski Area. Ultimately, the Petitioners also hoped to construct a light-rail transit and parking facility for approximately 750 cars, at the point where the highway reverts to two lanes, in order to reduce air pollution and traffic congestion into the city of Aspen.[1] CDOT claimed that the proposed parking and transit facility would satisfy federal Clean Air Act requirements and that such compliance was necessary in order to secure federal funding for the overall Highway 82 project. The County added that the facility would also serve as an intercept lot for visitors to Aspen and would provide parking for and access to a large public trail system owned by the County.

After the condemnation action was filed, the Petitioners and the Respondent reached a stipulated agreement regarding certain parcels to be used for the Highway 82 expansion, county road relocation, airport runway zones, open space, and wetland replacement and mitigation. However, the Respondent continued to challenge the authority of CDOT and the County to condemn the remaining parcels for the purpose of constructing the parking and transit facility. The trial court held an immediate possession hearing with regard to the remaining disputed parcels, at which time the court addressed whether the Petitioners had legal authority to condemn the property; whether the property was being acquired for predominately public purposes; whether good faith negotiations had been conducted prior to the filing of the condemnation action; and whether the Petitioners had an immediate need to take possession of the property.

---

1. Although the immediate plan provides a surface lot that can accommodate approximately 200 cars, the Petitioners have a long-term plan which they claim will provide a larger, tiered-structure that can accommodate 750 cars.

At the hearing, the trial court heard testimony from CDOT's project manager regarding the need for the property within the context of the Highway 82 project, as well as from a former County Manager regarding the County's overlapping need for the property as an intercept lot and as an access point to the County's recreational trail system. Following the hearing, the trial court issued an order detailing findings of fact and conclusions of law. In particular, the court concluded that CDOT possessed legal authority to condemn the property for parking and transit purposes, stating:

> While it is true that none of the statutes relied upon by petitioners expressly grant a right to condemn for parking purposes, the evidence establishes that transit parking is required to comply with the Clean Air Act. Without compliance with the Clean Air Act, the project cannot be done. The Department of Transportation has the power to condemn for highway purposes. Where the parking is a required element of highway construction, the right to condemn for parking must therefore be necessarily implied.

Thus, the trial court ruled that CDOT had the implied statutory authority to condemn the parcels for a transit and parking facility. Having found that CDOT possessed authority for the condemnation, the trial court did not reach the issue of whether the County had its own implied authority to condemn the property.

After the immediate possession hearing, the Respondent sought extraordinary relief with this Court pursuant to C.A.R. 21, which was denied. Subsequently, the trial court held a valuation hearing in order to determine the amount of compensation owed to the Respondent. After a final order was issued, the Respondent appealed the trial court's ruling to the court of appeals. Specifically, the Respondent challenged the trial court's findings that CDOT possessed legal authority to condemn the property, that the property was being acquired for a public purpose, that the condemnation was necessary, and that the Petitioners had negotiated in good faith prior to the condemnation.

The court of appeals reversed the trial court, ruling that neither CDOT nor the County had statutory authority to condemn the property for a parking and transit facility. *See Dep't of Transp. v. Stapleton,* 81 P.3d 1105 (Colo.App.2003). The court of appeals ruled, as pertinent here, that parking and transit facilities did not fall within the purview of CDOT's authority to condemn for "state highway purposes" pursuant to section 43–1–208(3), 11 C.R.S. (2003), nor could CDOT condemn the property as a remainder pursuant to section 43–1–210(1), 11 C.R.S. (2003). *Stapleton,* 81 P.3d at 1107–08. Additionally, the court of appeals found that the County lacked authority to condemn the property as necessary for "recreational facilities" under section 29–7–104, 9 C.R.S. (2003). *Stapleton,* 81 P.3d at 1109. Thus, the court of appeals held that the Petitioners lacked any statutory authority to condemn the disputed parcels. This appeal followed.[2]

We granted certiorari to address whether either or both of the Petitioners have the statutory authority to condemn the disputed property in order to construct a parking and transit facility.[3] We now find that CDOT's

---

**2.** Because it reversed the trial court's order on statutory authority grounds, the court of appeals did not reach the remaining issues raised by the Respondent. Specifically, the court did not address whether the trial court erred in ruling that the property was being acquired for primarily public purposes, that the condemnation was necessary, and that the Petitioners had engaged in good faith negotiations prior to the condemnation. Thus, these additional issues are not before us.

**3.** We granted certiorari on the following issues:

1. Whether CDOT's authority to condemn land for "state highway purposes" pursuant to 43–1–208, C.R.S.,, allows it to condemn land for transit parking when such parking is mandated by federal law and integral to the state highway project.

2. Whether a local government that can condemn land "necessary, suitable, or proper for park or recreational facilities" pursuant to 29–7–104, C.R.S., can condemn to provide vehicle parking needed to serve such parks and recreational facilities.

3. Whether CDOT's authority to condemn "remainder parcels" pursuant to 43–1–210(1), C.R.S., authorizes CDOT's condemnation of the parcels if CDOT cannot condemn for transit parking and the County cannot condemn for park and recreational facility parking.

authority to condemn land for "state highway purposes" under section 43–1–208(3) includes the authority to condemn lands adjacent to a state highway for the construction of a parking and transit facility that is an integral part of a broader state highway improvement project. Because CDOT's implied statutory authority to condemn the disputed parcels is sufficient to support the condemnation action before us, we do not reach the issue of whether the County also possesses statutory authority to condemn the same property. We therefore reverse the decision of the court of appeals insofar as it held that CDOT lacked statutory authority to condemn the disputed parcels pursuant to section 43–1–208(3), and remand for further proceedings consistent with this opinion.

## II. Analysis

■■■■ We have long held that in Colorado the power of eminent domain lies dormant in the state until the legislature speaks. *Potashnik v. Pub. Serv. Co.*, 126 Colo. 98, 101, 247 P.2d 137, 138 (1952). Accordingly, a party may not condemn private property without demonstrating that the taking has been statutorily authorized, either expressly or implicitly. *See State Dep't of Highways v. Denver and Rio Grande W. R.R. Co.*, 789 P.2d 1088, 1092 (Colo.1990) (holding that the Department of Highways did not have statutory authority to condemn a private way of necessity over railroad tracks on behalf of a landlocked ranch operator). Thus, in order for the Petitioners to condemn the Respondent's property, they must demonstrate that either CDOT or the County has been expressly or implicitly authorized by statute to condemn the disputed parcels. *Buck v. Dist. Court*, 199 Colo. 344, 347, 608 P.2d 350, 352 (1980) ("Private property may not be condemned, even for a purpose which is judicially determined to be a public use within the meaning of Colo. Const. Art. II, Sec. 15, in the absence of express or necessarily implied statutory condemnation authority."). Here, both CDOT and the County concede that condemnation of this property to construct a parking and transit facility is not expressly authorized by any statute, but instead argue that their authority to condemn the Respondent's property is necessarily implied. Con-sequently, in order to resolve this action, we must determine the scope of condemnation authority implicitly granted by the legislature through the relevant statutes.

### A. Doctrine of Necessary Implication

■■■■ To begin, we note that "narrow construction is the rule in determining the scope of the condemnation power delegated pursuant to legislative enactment." *Coquina Oil Corp. v. Harry Kourlis Ranch*, 643 P.2d 519, 522 (Colo.1982) (finding that a federal oil and gas lessee could not condemn private property for private use as a right-of-way based on a condemnation statute which was silent as to whether federal oil and gas lessees could exercise the power granted therein). Because we construe the statute against the entity asserting the authority, we will not find an implied grant of the condemnation authority through "vague or doubtful language." *Beth Medrosh Hagodol v. City of Aurora*, 126 Colo. 267, 272, 248 P.2d 732, 735 (1952) (holding that a municipality could not condemn private property under a statute granting certain enumerated parties the authority to condemn such lands where the statute did not include municipalities); *see also, e.g., Mack v. Town of Craig*, 68 Colo. 337, 339, 191 P. 101, 101 (1920) ("When the right to exercise the power [of eminent domain] can only be made out by argument and inference, it does not exist.") (quoting with approval John Lewis, *A Treatment on the Law of Eminent Domain in the United States* § 371 (3d ed. 1909)). Accordingly, we have declined to find an implied grant of authority to condemn property where the statute relied upon by the condemning body is either silent on the subject of condemnation altogether or does not clearly indicate that the legislature intended for the body asserting the power to have such authority.

In *Bd. of County Comm'rs v. Intermountain Rural Elec. Ass'n*, 655 P.2d 831 (Colo.1982), for example, we affirmed a trial court's ruling that a county lacked statutory authority to condemn buildings needed for county office space. There, the county relied upon statutes which directed that "[e]ach county, at its own expense, shall provide a suitable courthouse, a sufficient jail, and other neces-

sary county buildings, and keep them in repair," and that counties "provide suitable rooms for county purposes." *Id.* at 832 n. 1. Thus, the "Board argue[d] that since the county has a mandatory duty to provide county offices, the power to acquire property to carry out that duty must necessarily be implied." 655 P.2d at 833.

In rejecting the county's argument, we noted that the statutes relied upon by the county, which directed it to provide and maintain certain county buildings, made no mention whatsoever of the power of eminent domain. *Id.* On the other hand, we cited to several statutes which did expressly delegate to county commissioners the right to condemn properties for various county needs, including roads, airports, and cemeteries. *Id.* Thus, we agreed with the district court's conclusion "that the legislature's failure to grant specific authority for such condemnation indicates a legislative judgment that counties are not empowered to invoke eminent domain to acquire property for office space." *Id.* at 834. We therefore declined to find implicit statutory authority to condemn the property at issue.

In *Buck,* 199 Colo. 344, 608 P.2d 350, however, we found that a railroad did possess implied statutory authority to condemn lands outside its express statutory right-of-way. There, the railroad company sought to condemn certain parcels for the purpose of constructing "dust levees" parallel to its railroad tracks. *Id.* at 345–46, 608 P.2d at 351. The company relied upon a statute providing that a railroad "may acquire title . . . in the manner provided by law for the condemnation of real estate or right-of-way." *Id.* at 347, 608 P.2d at 352. The landowners, however, relied upon a separate statute stating that a railroad corporation may "lay out its road, not exceeding two hundred feet in width, and to construct the same; and for the purpose of cuttings and embankments to take as much more land as may be necessary for the proper construction and security of the railway." *Id.* Thus, according to the landowners, the railroad could only condemn property needed for the dust levees within the two hundred foot right-of-way because the statute only expressly allowed railroad

companies to condemn land for "cuttings and embankments" beyond that geographical limitation.

We disagreed with the landowners. Noting our responsibility to construe the statutes together and to give effect to each, we determined that the legislature did not intend such a rigid reading of the right-of-way statute. *Id.* at 347–48, 608 P.2d at 352. Instead, we concluded that the statutes, when read together, necessarily implied that the railroad had authority to condemn land beyond the statutory right-of-way for the purposes of constructing "a railroad's physical facilities . . . which have a *sufficiently direct functional relationship* to the operations of the railroad." *Id.* at 348, 608 P.2d at 352 (emphasis added). Thus, because the dust levees were integral to the effective operation of the railroad, we found that the General Assembly must have intended for the railroad company to have implied authority to condemn land needed for their construction.

In sum, while we have acknowledged the presumption against implicit grants of condemnation authority based on "vague and doubtful" language, we have also recognized that such authority is necessarily implied under certain circumstances. Central to our analysis has always been the underlying intent of the legislature in enacting the relevant condemnation statute. In particular, where the General Assembly has granted to a body the authority to condemn property for a specific use, we may infer that the General Assembly intended that the body would also have authority to condemn land for purposes bearing a "sufficiently direct functional relationship" to the specified use. *Id.* With these principles in mind, we turn to the instant action.

### B. Condemnation of Property for a Parking & Transit Facility

CDOT argues that the condemnation of the property for the construction of a parking and transit facility, as part of a larger highway improvement project, falls within the scope of authority granted to it under the statute allowing CDOT to condemn land necessary for "state highway purposes." § 43–1–208(3). Applying the principles set forth

above, we must determine whether the General Assembly intended CDOT to have such condemnation authority. Taking into consideration the language used in section 43–1–208(3) and the goals it seeks to further, we conclude that the legislature intended CDOT to have the authority to condemn those properties which are necessary in order for CDOT to effectively complete state highway improvements. Specifically, we find that CDOT has implied statutory authority to condemn lands needed for construction of a parking and transit facility bearing a direct and functional relationship to the State Highway 82 improvement project.

We begin with the language of section 43–1–208(3) itself, noting that while section 43–1–208(3) authorizes CDOT to condemn lands for "state highway purposes," and other sections define "state highway" and "highway," the term "state highway purposes" is nowhere defined by the legislature. As such, we must resort to basic principles of statutory construction in order to determine the intended scope of the term "state highway purposes." *See, e.g., Civil Service Comm'n v. Pinder,* 812 P.2d 645, 648 (Colo.1991) (noting that "[o]ur primary task in interpreting a statute is to give it a construction and interpretation that will render it effective in accomplishing the purpose for which it was enacted"). We construe a statute as a whole, ascribing to each word and phrase its familiar and generally accepted meaning, so as to reflect the legislative intent of the General Assembly. *Cacioppo v. Eagle County Sch. Dist.,* 92 P.3d 453, 463 (Colo.2004). In particular, we presume that the General Assembly understands the legal import of the words it uses and does not use language idly, but rather intends that meaning should be given to each word. *People v. McNeese,* 865 P.2d 881, 884 (Colo.App.1993). Finally, in determining the meaning of any one statutory section, we may look to the legislative scheme as a whole in order to give effect to the General Assembly's intent. *Simpson v. Bijou Irrigation Co.,* 69 P.3d 50, 59 (Colo. 2003).

The Respondent asserts that statutory definitions of "state highway" and of "highway" preclude a finding that a parking and transit facility may be deemed a "state highway purpose" in the context of this condemnation action. Section 43–1–204, 11 C.R.S. (2003), defines a "state highway" as a "right-of-way or location, whether actually used as a highway or not, designated for the construction of a state highway upon it." Section 43–1–203 further states that a "'[h]ighway' includes bridges on the roadway and culverts, sluices, drains, ditches, waterways, embankments, retaining walls, trees, shrubs and fences along or upon the same and within the right-of-way." According to the Respondent, these statutory sections, read *in pari materia* with section 43–1–208(3), limit CDOT's authority to condemn for "state highway purposes" only within the right-of-way area and only to construct those structures specifically enumerated in the "highway" definition. We disagree.

Instead, applying the principles of statutory construction set forth above, we presume that in using the phrase "state highway purposes," the General Assembly intended that CDOT have a condemnation authority which was broader than that needed simply for constructing "state highways." To read the grant of authority as restricted to the list of structures included in the definition of "highway" under section 43–1–203, as urged by the Respondent, would render the word "purposes" in section 43–1–208(3) superfluous. *See Bd. of County Comm'rs v. Vail Assocs., Inc.,* 19 P.3d 1263, 1273 (Colo.2001) ("We construe statutory and constitutional provisions as a whole, giving effect to every word and term contained therein, whenever possible."). Thus, in order to avoid such a construction, we conclude that the legislature intentionally included the word "purposes" in order to give CDOT a condemnation authority which encompasses needs beyond those lands strictly necessary for construction of a "highway" as defined in section 43–1–203. Instead, the phrase "state highway purposes" must be read as conferring upon CDOT the authority to condemn lands for purposes which are integral to the construction, maintenance, and improvement of state highways.

Our reading of the phrase "state highway purposes" is bolstered by consideration of the legislative scheme as a whole. In its

legislative declaration regarding the creation of a department of transportation, the General Assembly observed that the creation of CDOT was necessary in order to:

>    (a) Provide strategic planning for state-wide transportation systems to meet the transportation challenges to be faced by Colorado in the future;

>    (b) Promote coordination between different modes of transportation; [and]

>    . . . .

>    (e) Enhance the state's prospects to obtain federal funds by responding to federal mandates for multi-modal transportation planning.

§ 43-1-101(1), 11 C.R.S. (2003). Thus, the General Assembly clearly intended CDOT to adopt a comprehensive approach to transportation issues in Colorado.[4]

Viewing the use of the phrase "state highway purposes" within the context of the legislative scheme as a whole, including the General Assembly's statements regarding the comprehensive objectives of CDOT, we conclude that the legislature intended that CDOT's condemnation authority would allow it to effectively carry out a large state highway improvement project. Specifically, we find that in authorizing CDOT to condemn lands needed for "state highway purposes," the General Assembly intended that CDOT would have the implied authority to condemn lands for uses bearing a "sufficiently direct functional relationship" to a state highway project.[5] *Buck*, 199 Colo. at 348, 608 P.2d at 352. Of course, whether such a relationship exists between the expressly authorized use and the use for which the condemning body seeks implied condemnation authority will turn upon the facts and circumstances surrounding each condemnation action.

Here, CDOT has demonstrated that the lane reduction from four lanes to two lanes across from the Buttermilk Ski area, as provided for in the Highway 82 improvement project, combined with projected increases in traffic, would lead to traffic congestion as well as pollution levels which exceed federal Clean Air Act requirements. Thus, CDOT concluded that the parking and transit facility, to be built at the site of that lane reduction, was necessary in order to reduce traffic congestion and pollution, to encourage drivers to transfer to buses and, eventually, light-rail transportation, and to ensure receipt of federal funding associated with the State Highway 82 project. Accordingly, CDOT has shown that the parking and tran-

---

4. In fact, we recently acknowledged this more comprehensive approach to transportation in the context of section 38-1-114(2)(d), 10 C.R.S. (2003), which governs the method of calculating compensation for highway acquisitions:

> Modern highway systems include many features not envisioned within the common understanding of the term "highway" in past generations, such as complex interchanges, high-occupancy vehicle lanes, park-and-ride facilities, and electronic message boards. The General Assembly enacted the takings compensation statute to reflect the complex nature of modern highway systems. In so doing, the General Assembly attempted to strike a balance between the interests of individual landowners whose property is taken and the interests of the taxpaying public.

E-470 Pub. *Highway Auth. v. Revenig*, 91 P.3d 1038, 1043 (Colo.2004).

5. The Respondent argues that the General Assembly's failure to pass Senate Bill 01-008, which would have expanded CDOT's express condemnation powers to include "state transportation purposes," suggests that the General Assembly did not intend for CDOT to have the implied condemnation authority at issue today. However, as we have previously recognized, "nothing of significance can be gleaned from the failure of the legislature to pass" particular legislation. *U.S. Transmission Sys., Inc. v. Bd. of Assessment Appeals*, 715 P.2d 1249, 1255 (Colo. 1986) (noting that there existed many conceivable reasons for the General Assembly's failure to expand the statutory definition of "telephone corporation"); *see also United States v. Craft*, 535 U.S. 274, 287, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) ("[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute.") (internal quotations omitted); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change."). Here, the failure of SB 01-008 may be attributable to any number of causes, including a possibility that the legislature felt that CDOT already possessed such broad condemnation authority. Therefore, we find no indication of legislative intent based on the General Assembly's failure to pass SB 01-008.

sit facility is an integral part of the Highway 82 improvement project, and will certainly further the legislature's stated goals of strategically addressing transportation challenges, "[p]romot[ing] coordination between different modes of transportation," and enhancing Colorado's "prospects to obtain federal funds." § 43–1–101(1)(b), (e). As such, we find that the construction of the parking and transit facility bears a "sufficiently direct functional relationship," *see Buck*, 199 Colo. at 348, 608 P.2d at 352, to the improvement of State Highway 82.[6] We therefore conclude that, pursuant to its authority to condemn lands needed for "state highway purposes" under section 43–1–208(3), CDOT has the implied authority to condemn the disputed parcels at issue today.[7]

### III. Conclusion

For the reasons discussed above, we reverse the decision of the court of appeals and return this case to that court for proceedings consistent with this opinion.

Justice COATS concurs in the judgment only.

Justice KOURLIS dissents.

Justice COATS, concurring in the judgment only.

I agree with the majority's conclusion that the Colorado Department of Transportation has the authority to condemn the property at issue here, and I therefore concur in its judgment reversing the court of appeals. Because I believe, however, that the General Assembly has expressly granted the Department the requisite authority, I do not join its discussion or conclusion concerning necessary implication. Whether or not the authority to condemn property for the proposed

parking and transit facility would have necessarily been implied in a grant of authority to condemn private property for a state highway alone, it is clear to me that it is included within the broader "state highway purposes," for which authority was actually granted, and that it would serve a "public use," as required by the state constitution.

The breadth of the Department's authority is entirely a matter of construction. Except in specified circumstances not at issue here, private property may not be condemned pursuant to statutory authority unless the purpose for which the condemnation is sought is judicially determined to be a public use within the meaning of Colo. Const., Art. II, Sec 15. *Buck v. District Court*, 199 Colo. 344, 346, 608 P.2d 350, 351 (1980). Even for such public uses, however, private property may not be condemned in the absence of authorization from the General Assembly that is either express or necessarily implied. *Id.*, 199 Colo. at 348, 608 P.2d at 352. Whether the condemnation of particular private property is authorized is therefore ultimately a matter of constitutional and statutory interpretation, or more precisely, a matter of statutory interpretation in light of constitutional limitations.

Although we have often repeated that statutory authorization to condemn private property must be construed narrowly, the legislature's power to authorize condemnation, as it sees fit, is limited only by the constitutional prescription that condemnation must be for a public use. The scope of any particular statutory authorization to condemn is therefore construed, just as any other statute, according to long-accepted principles of statutory construction. Rather than altering the applicable principles, or short-circuiting the pro-

---

**6.** Although the trial court relied largely on the necessity of federal funding to support its finding that CDOT had the necessarily implied authority to condemn the property, we do not rest our holding on such narrow grounds. Rather, in light of the many purposes which the facility will accomplish, including the reduction of traffic congestion and air pollution, as well as the receipt of federal funds, we find that the construction of the parking and transit facility is integral to the effective completion of the State Highway 82 improvement project. As such, the facility

falls squarely within the notion of "state highway purposes" as intended by the General Assembly.

**7.** Because we find that CDOT has the legal authority to condemn the property at issue in this action, we do not reach the issue of whether the County has authority to condemn land for a parking and transit facility under section 29–7–104, which grants local governments express statutory authority to condemn property "necessary, suitable, or proper for park or recreational facilities."

cess of statutory interpretation altogether, the requirement for a narrow construction merely guides the application of these rules and directs that any remaining ambiguity in legislative intent be resolved against, rather than in favor of, authorization. *Cf. People v. Thoro Products Co.,* 70 P.3d 1188, 1198 (Colo. 2003) ("[I]f after utilizing the various aids of statutory construction, the General Assembly's intent remains obscured, the rule of lenity should be applied to resolve the ambiguity.").

By its own terms, section 43-1-208(3), 11 C.R.S. (2003), grants the Department broad condemnation authority. Had the General Assembly granted the Department authority to condemn property for state highways alone, it may have become necessary to consider whether condemnation of more than the highway's right-of-way were necessarily implied. Because the legislature has expressly granted the Department the authority to condemn private property for "state highway purposes," however, it is only necessary to construe the statutory language and determine the scope of the term "purposes." Whether the legislature intended by "purposes" merely the construction of the highway or, as the term on its face implies, any purpose connected with the highway, including its effective and efficient operation consistent with other public goals, is clearly a question of statutory interpretation. It would be difficult, however, to see how use of the term "purposes" could have been intended to limit rather than expand condemnation authority otherwise implied in the term "state highway" itself. *See, e.g., United States v. Langford,* 688 F.2d 1088, 1097 (7th Cir.1982) ("Congress ... saw fit to broaden the scope of the [child pornography] legislation through the use of the term 'purpose,' [a] term intended to include each and every aspect of the business enterprise ...."); *but see* Kourlis, J., dissenting at 945–946.

Uncharacteristically, article II, section 15 of the state constitution expressly assigns to the judiciary the task of giving meaning to the term "public use." Because the legislature is presumed to intend that its statutes be constitutional, section 2-4-201(1)(a), 1 C.R.S. (2003); *see Le Manufacture Fran-caise v. District Court,* 620 P.2d 1040 (Colo. 1980) (legislature did not intend for long-arm statute to be construed to grant jurisdiction in violation of due process clause), we have previously construed broad grants of condemnation authority as implicitly limited by this court's interpretation of the public use requirement. In the related context of railroad lines, we have therefore held that legislative authority to condemn property "for any lawful purpose connected with the operations of the company" was implicitly limited to those purposes having "a sufficiently direct functional relationship to the operations of the railroad to satisfy the public use requirement." *Buck,* 199 Colo. at 347–48, 608 P.2d at 352. Nowhere, however, did we suggest, as the majority now finds, that the legislature's broad "purpose" language failed to expressly include condemnation authority for the dust levees at issue there or that such authority was "necessarily implied" only to the extent that the dust levees bore "a sufficiently direct functional relationship to the operations of the railroad." Maj. op. at 942. The relationship between a purpose requiring condemnation of property outside the actual right-of-way, and the railroad itself, was significant only in determining whether that additional purpose, like the railroad line itself, could be characterized as a public use.

Even if one could imagine some "state highway purpose" that might not constitute a public use, it is at least clear that condemnation of private property to comply with federal regulations governing construction of the highway constitutes condemnation for a public use, just like condemnation of the right-of-way itself. The trial court made factual findings of these purposes, which are adequately supported in the record. I consider it unnecessary to define the outer limits of the term "state highway purposes" or to determine its necessary implications. Whether or not the purposes at issue here can be categorized as essential to the construction or operation of the highway, the Department clearly seeks them for "state highway purposes."

Justice KOURLIS, dissenting:

This case is about the breadth of a Colorado statute that authorizes the Colorado

Department of Transportation (CDOT) to exercise the power of eminent domain. The majority concludes that CDOT has the authority to condemn Stapleton's property for a parking lot because a parking lot constitutes a "state highway purpose" within the meaning of section 43–1–208(3), 11 C.R.S. (2003). Maj. op. at 942. To reach that outcome, the majority liberally construes the organic legislation granting CDOT condemnation power and holds that the parking lot at issue in this case has a "'sufficiently direct functional relationship'" to the overall highway project. Maj. op. at 944. I disagree. Decades of precedent require us to construe statutes granting condemnation power narrowly and against the entity seeking to condemn private property. Following that precedent leads, in my view, to the conclusion that CDOT lacks authority to condemn private property for a parking lot.

Furthermore, even if CDOT has the authority under some circumstances to condemn private property for parking facilities, the record before us does not support that result in this case. The majority concludes that this particular parking facility is an "integral part of a broader state highway improvement project." Maj. op. at 941. However, the record indicates that this parking facility is intended to serve a variety of purposes. Some of those purposes are public and some are private. Some of those purposes are abstractly related to the highway project and some have nothing to do with it whatsoever. Hence, the particular uses reflected in the evidence here are all too removed from the purposes authorized by section 43–1–208(3) to support the majority's holding. For these reasons, I respectfully dissent. I would affirm the court of appeals both in reasoning and in judgment.

## I. FACTS AND PROCEDURAL HISTORY

The Respondent, Craig R. Stapleton, owned an undeveloped 23.4 acre parcel of land located on the west side of Highway 82, immediately north of the Buttermilk Ski Area, just outside of Aspen, Colorado.

In 2000, CDOT began a project designed to widen State Highway 82 at the entrance to Aspen. In addition to the actual widening of Highway 82, the project also involved the construction of parking and transit facilities. These facilities were part of a plan to reduce air pollution and traffic congestion around Aspen by providing a transfer point for skier trips and commuter bus trips into the Aspen area. In turn, the reduction of air pollution and traffic congestion would bring Aspen into compliance with federal standards, including the Clean Air Act. Compliance with these standards was a prerequisite to the receipt of federal highway funds to complete the project.

CDOT initiated a condemnation action against Stapleton. CDOT sought to acquire and use Stapleton's property for actual highway improvements and for the construction of transit and parking facilities. Pursuant to an intergovernmental agreement, the co-petitioner, Pitkin County (County), joined in the condemnation action. The County asserted an interest in Stapleton's property for a variety of purposes including open space, ensuring clear zones near the airport runway, and providing parking for a number of trails converging on or near Stapleton's land. CDOT and County identified the same areas for use as parking.

After the petition to condemn was filed, Stapleton stipulated to the taking of approximately two-thirds of an acre of his land for actual improvements to Highway 82. In addition, Stapleton stipulated to the taking of parcels of his land for open space and for clear zones for the airport. However, Stapleton challenged the authority of CDOT or County to condemn the remaining portions of his property for parking lots or transit facilities. Thus, only those portions of Stapleton's land designated by CDOT and County for parking and/or transit facilities are at issue in this appeal.

The trial court held an immediate possession hearing. At this hearing, representatives of both CDOT and County testified. At that hearing, several important facts emerged, including the following: (1) at the present time, there is no plan or funding available to build the parking spaces needed to comply with the Clean Air Act; (2) it is

unrealistic and unlikely that visitors would drive all the way to Aspen only to park on the outskirts of town; (3) existing facilities used for mass transit are already underutilized; (4) recreational users would be the primary users of this parking facility, and, at least during the winter months, customers of Buttermilk Ski Area would be the primary users; and (5) there is a very real possibility that after Stapleton's property is condemned for "highway purposes," it will be leased back to the Buttermilk Ski Area, a private corporation, to accommodate and supplement its own inadequate parking facilities.

After the immediate possession hearing, the trial court issued an order containing findings of fact and conclusions of law. The trial court concluded that although the Buttermilk Ski Area would certainly benefit from the acquisition of Stapleton's property, the primary purpose for this condemnation was to bring the highway expansion project into compliance with the Clean Air Act. Specifically, the court stated:

> While it is true that none of the statutes relied upon by petitioners expressly grant a right to condemn for parking purposes, the evidence establishes that transit parking is required to comply with the Clean Air Act. Without compliance with the Clean Air Act, the project cannot be done. The Department of Transportation has the power to condemn for highway purposes. Where the parking is a required element of highway construction, the right to condemn for parking must therefore be necessarily implied. As to the authority of the petitioners to condemn for wetland mitigation, airport protection and open space, the Court finds that there is sufficient statutory authority to support the petition.

Thus, the trial court's conclusion that CDOT had the authority to condemn Stapleton's land was based exclusively on the fact that parking was necessary in order to comply with the Clean Air Act.

Following the trial court's order granting immediate possession of Stapleton's land to CDOT and County, Stapleton filed a Petition for Extraordinary Relief with this court.

That petition was denied.[1] Next, the trial court conducted a valuation trial to fix the compensation for the taking. Following that trial, Stapleton appealed to the court of appeals challenging the trial court's ruling that CDOT and County had the legal authority to condemn his land for the purpose of constructing parking and transit facilities.

The court of appeals reversed the district court's judgment in *Dep't of Transp. v. Stapleton*, 81 P.3d 1105 (Colo.App.2004).

First, the court of appeals held that CDOT was not expressly authorized, or authorized by "necessary implication," to condemn Stapleton's property for parking or transit facilities. *Id.* at 1108. Specifically, the court of appeals held that section 43–1–208(3), 11 C.R.S. (2003), which authorizes the transportation commission to acquire land for "state highway purposes," does not by implication grant the power to acquire property for parking or transit facilities. *Id.*

Second, the court of appeals rejected County's argument that it had the authority to condemn Stapleton's land for "recreational parking purposes" pursuant to section 29–7–104, 9 C.R.S. (2003). *Id.* at 1109. Specifically, the court of appeals held that "parking lots and transit facilities are not recreational uses of land as defined by [section] 29–7–107." *Id.*

Finally, the court of appeals rejected CDOT's argument that it had the authority to condemn Stapleton's property for parking and transit facilities pursuant to section 43–1–210(1), 11 C.R.S. (2003). *Id.* at 1108. That provision states that CDOT may condemn an entire parcel of land if a partial taking renders the remainder "in such shape or condition as to be of little value to its owner or to give rise to claims or litigation concerning severance or other damage." The court of appeals held that this statutory provision only applies to situations involving partial acquisitions of property. Because Stapleton's entire property was being acquired by CDOT and County, the court of appeals concluded that section 43–1–210(1) was inapplicable. *Id.*

---

1. This court issued an order denying Stapleton's Petition for Extraordinary relief on July 6, 2001.

I would have granted Stapleton's Petition. Justice Bender did not participate.

## II. ANALYSIS

To determine whether CDOT has the authority to condemn Stapleton's property, I look first to the organic legislation granting CDOT the authority to exercise the power of eminent domain. Section 43–1–208(3) states that "[t]he transportation commission also has the power and is authorized to proceed in the acquisition of the lands of private persons for *state highway purposes* ..." (emphasis added). The term "state highway" is defined by statute as "a right-of-way or location, whether actually used as a highway or not, designated for the construction of a state highway upon it." § 43–1–204. A "highway" includes "bridges on the roadway and culverts, sluices, drains, ditches, waterways, embankments, retaining walls, trees, shrubs, and fences along or upon the same and within the right-of-way." § 43–1–203. The power to condemn property for parking or transit facilities is not included.

The majority concedes, as it must, that CDOT lacks express authority to condemn private property for a parking lot. However, the majority examines the language of section 43–1–208(3) and concludes that the power to condemn Stapleton's property must be "necessarily implied." Specifically, the majority *"presumes* that in using the phrase 'state highway purposes,' the General Assembly intended that CDOT have a condemnation authority which is *broader* than that needed simply for constructing 'state highways.'" Maj. op. at 943. (Emphasis added). The majority also concludes that "the phrase 'state highway purposes' *must* be read as conferring upon CDOT the authority to condemn lands for purposes which are integral to the construction, maintenance, and improvement of state highways." Maj. op. at 943. (emphasis added). I do not agree with this construction.

The power of eminent domain is vested in the State of Colorado and that power lies dormant until the legislature speaks. *Bd. of County Comm'rs v. Intermountain Rural Elec. Assoc.*, 655 P.2d 831, 833 (Colo.1983); *Potashnik v. Public Service Co. of Colorado*, 126 Colo. 98, 100, 247 P.2d 137, 138 (Colo. 1952). In determining the scope of condemnation power pursuant to legislative enactment, we construe the grant strictly. *Dep't of Highways v. Denver and Rio Grande R.R. Co.*, 789 P.2d 1088, 1092 (Colo.1990) (citing *Coquina Oil Corp. v. Harry Kourlis Ranch*, 643 P.2d 519, 522 (Colo.1982)). Necessarily, we resolve uncertainty in the ambit of the condemnation power against the person or entity asserting the right to condemn. *Coquina Oil*, 643 P.2d at 522. This rule of strict construction is premised on the fact that "the power of eminent domain is one of the most harsh proceedings known to the law." 26 Am.Jur.2d *Eminent Domain* § 20 (2004); *see also* 3 Sutherland Statutory Construction § 64:6 (6th ed. 2004) (construing statutes narrowly and in favor of the owners of property sought to be condemned "is premised on the view that the power of condemnation is in derogation of common right because it is an interference with traditional and long established common-law or statutory property rights"). Thus, the right to condemn property "must clearly appear either by express grant or by necessary implication." *Potashnik*, 126 Colo. at 100, 247 P.2d at 138. Authority by necessary implication excludes vague or doubtful language and, in the face of doubt, courts must conclude that there has been no grant of such power by the state. *Beth Medrosh Hagodol v. City of Aurora*, 126 Colo. 267, 272, 248 P.2d 732, 735 (Colo.1952) ("The power [of eminent domain] is specifically and unequivocally granted, or it is withheld.").

Stapleton argues that the statutory definitions of "state highway" and of "highway" preclude a finding that a parking and transit facility may be deemed a "state highway purpose" in the context of this condemnation action because nowhere do these definitions include parking. The majority rejects that argument by concluding that it would render the word "purposes" in section 43–1–208(3) superfluous. Maj. op. at 943.

I read the word "purposes" to mean something entirely different. In the context of section 43–1–208(3), the word "purposes" appears as a word of limitation—allowing CDOT to condemn property *only* for those "purposes" that fall within the definition of a "highway" or "state highway." Viewing this statutory language through the lens of strict

construction, and honoring the requirement that statutes granting condemnation power be construed against the entity seeking to exercise that power, the obligation of this court is to view the term "purposes" as narrowly as possible. Thus, this court should not presume that the General Assembly intended to broaden CDOT's condemnation power when a narrower construction is available.

Furthermore, shortly after condemnation proceedings began in this case, the legislature introduced Senate Bill 01–008 (SB–01–008). The Bill Summary provided:

> **Transportation, Legislation, Review, Committee.** Expands the authority of the department of transportation in connection with its powers of eminent domain, which authority is currently limited to the acquisition and disposition of property for state highway purposes, to include the acquisition and disposition of property for state transportation purposes.

This bill would have expanded CDOT's powers of eminent domain to include "state transportation purposes" rather than the more limited condemnation power for state highway purposes. The term state transportation purposes was defined as "the transport of persons or property by motor vehicle, bus, truck, railroad, *light rail, mass transit,* or airplane." (emphasis added). Clearly, SB–01–008 would have expanded CDOT's condemnation powers to include exactly the type of project at issue in this case. However, this bill never made its way out of committee. Therefore, a logical assumption is that the General Assembly did not intend to expand CDOT's condemnation power to include the construction of transit or parking facilities.

The majority cites to *Buck v. Dist. Court,* 199 Colo. 344, 608 P.2d 350 (1980), to support its conclusion that condemnation authority must be necessarily implied in this case. In *Buck,* this court addressed whether a railroad had statutory authority to condemn lands for dust levees outside of the 200–foot–wide road expressly authorized by statute. In holding that the authority to construct dust levees must be necessarily implied, this court concluded that the General Assembly "did not intend the 200–foot width limitation to apply to the condemnation of private property for the construction of a railroad's physical facilities ... which have a sufficiently direct *functional* relationship to the operation of the railroad...." *Id.* at 352 (emphasis added).

In this case, the parking facility that CDOT seeks to build has no "functional" relationship to the highway project. Rather, the trial court determined that the purpose of the parking facility was compliance with contractual and environmental obligations that have no bearing on the functional aspects of the highway project. *See State Dep't of Highways v. Denver and Rio Grande Western R.R. Co.,* 757 P.2d 181, 183 (Colo.App.1988), *aff'd* 789 P.2d 1088 (holding that section 43–1–208 does not expressly or implicitly authorize condemnation of a private way of necessity for property having no connection with highway alteration other than to fulfill a contractual obligation).[2] Thus, even the majority's reliance on *Buck* to conclude that "the phrase 'state highway purposes' must be read as conferring upon CDOT the authority to condemn lands for purposes which are integral to the *construction, maintenance,* and *improvement* of state highways" has no application here. (emphasis added). Maj. op. at 943. Nothing about the parking lot in this case serves a functional purpose related to the construction, maintenance, or improvement of Highway 82.

## III. CONCLUSION

Interpreting section 43–1–208(3) as narrowly as possible, and resolving all ambigui-

---

**2.** Additionally, it appears that even the stated primary purpose of the parking and transportation facility—bringing the highway expansion project into compliance with the Clean Air Act—is not supported by the evidence in the record. To the contrary, the record demonstrates there is no plan or funding needed to build the parking spaces to comply with the Clean Air Act; the future parking facility is unlikely to attract visi-

tors, and would most likely benefit the Buttermilk Ski Area, a private corporation. In any event, even assuming the presence of record support for the claim that the parking project will serve CDOT's purpose in meeting its contractual obligations, I remain convinced that compliance with Clean Air requirements has insufficient nexus to "state highway purposes."

ties against CDOT, I conclude that CDOT does not have the authority to condemn Stapleton's property for a parking lot. Furthermore, the record does not support a conclusion that the parking lot at issue here has a sufficiently direct functional relationship to the Highway 82 project to subsume it within *Buck's* necessary implication holding. Clean Air Act compliance is important, even critical. It is *not*, however, a state highway purpose which can bootstrap CDOT into authority to condemn private property for a parking lot. Therefore, I respectfully dissent.